# FIRST AGRICULTURAL NATIONAL BANK OF BERKSHIRE COUNTY v. STATE TAX COMMISSION.

No. 755. Argued April 22, 1968.—Decided June 17, 1968.

*Ronald H. Kessel* argued the cause for appellant. With him on the brief were *John P. Weitzel* and *Alex J. McFarland*.

*Alan J. Dimond,* Assistant Attorney General of Massachusetts, argued the cause for appellee. With him on the brief were *Elliot L. Richardson,* Attorney General, *Walter H. Mayo III,* Assistant Attorney General, and *Mark L. Cohen,* Deputy Assistant Attorney General.

Briefs of *amici curiae* were filed by *James Lawrence White* for the Colorado Bankers Assn.; by *William C. Sennett,* Attorney General, *John J. Gain,* Assistant Attorney General, and *Edward T. Baker* and *George W. Keitel,* Deputy Attorneys General, for the Commonwealth of Pennsylvania; by *Louis J. Lefkowitz,* Attorney General, *Ruth Kessler Toch,* Solicitor General, and *Robert W. Bush,* Assistant Attorney General, for the State of New York, and by *James F. Bell* and *Brian C. Elmer* for the National Association of Supervisors of State Banks.

MR. JUSTICE BLACK delivered the opinion of the Court.

The principal issue raised by this case concerns the extent to which States may tax a national bank. The

Supreme Judicial Court for the Commonwealth of Massachusetts held that appellant, First Agricultural National Bank of Berkshire County, was subject to Massachusetts' recently enacted sales and use taxes [1] on purchases for its own use of tangible personal property. For reasons to be stated we believe this decision was erroneous, and we reverse.

As long ago as 1819, in the historic case of *M'Culloch v. Maryland,* 4 Wheat. 316, this Court declared unconstitutional a state tax on the bank of the United States since, according to Chief Justice Marshall, this amounted to a "tax on the operation of an instrument employed by the government of the Union to carry its powers into execution." 4 Wheat., at 436–437. A long line of subsequent decisions by this Court has firmly established the proposition that the States are without power, unless authorized by Congress, to tax federally created, or, as they are presently called, national, banks. *Owensboro Nat. Bank* v. *Owensboro,* 173 U. S. 664, 668; *Des Moines Nat. Bank* v. *Fairweather,* 263 U. S. 103, 106; *First Nat. Bank* v. *Hartford,* 273 U. S. 548, 550; *Iowa-Des Moines Nat. Bank* v. *Bennett,* 284 U. S. 239, 244. As recently as 1966, MR. JUSTICE FORTAS, speaking for a unanimous Court, thought this ancient principle so well established that he used national banks as an example in holding the American Red Cross immune from state taxation:

> "In those respects in which the Red Cross differs from the usual government agency—*e. g.,* in that its employees are not employees of the United States, and that government officials do not direct its everyday affairs—the Red Cross is like other institutions—*e. g., national banks*—whose status as tax-immune instrumentalities of the United States is

---

[1] Acts and Resolves, 1966, c. 14, §§ 1 and 2.

*beyond dispute." Department of Employment* v. *United States,* 385 U. S. 355, 360. (Emphasis added.)

The decision below recognized the strong precedents against taxation, but the Massachusetts Supreme Judicial Court was of the opinion that the status of national banks has been so changed by the establishment of the Federal Reserve System[2] that they should no longer be considered nontaxable by the States as instrumentalities of the United States. Essentially the reasoning of the Supreme Judicial Court is that under present-day conditions and regulations there is no substantial difference between national banks and state banks; and the implication of this is, of course, that national banks lack any unique quality giving them the character of a federal instrumentality. Because of pertinent congressional legislation in the banking field, we find it unnecessary to reach the constitutional question of whether today national banks should be considered nontaxable as federal instrumentalities.

As will be seen, Congress has been far from reluctant to pass legislation in the banking field. There are important committees on banking and currency in both Houses which continually monitor banking affairs and propose new legislation when changes are felt to be needed. For purposes of this case, the most important piece of banking legislation is 12 U. S. C. § 548[3] which

---

[2] The Federal Reserve Act of December 23, 1913, c. 6, 38 Stat. 251, 12 U. S. C. § 221 *et seq.*

[3] This section provides in pertinent part:

"The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or

originated as part of the Act of June 3, 1864, c. 106, § 41, 13 Stat. 111. This section allows state taxation of national banks in any one of four specified ways in addition to taxes on their real estate. Before this legislation was originally enacted in 1864, there was sharp controversy in the Congress over the extent to which the States should be allowed to tax national banks. A vocal opponent to *any* state taxation of national banks was the powerful Senator Sumner of Massachusetts, who said:

> "If you allow the State to interfere with the proposed system [of national banks] in any way, may they not embarrass it? Where shall they stop? Where will you run a line?
>
> .    .    .    .    .
>
> "Now, sir, every consideration, every argument which goes to sustain this great judgment [*M'Culloch* v. *Maryland*] may be employed against the proposed concession to the States of the power to tax this national institution in any particular, whether directly or indirectly." Cong. Globe, 38th Cong., 1st Sess., 1893–1894 (1864).

On the other side, proposed amendments expressly permitting much broader state and local taxation of national banks were introduced, debated, and rejected by the Congress. Among these was an amendment introduced in the House which would have made national banks

---

holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income . . . .

"1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others . . . .

.    .    .    .    .

"3. Nothing herein shall be construed to exempt the real property of associations from taxation in any State or in any subdivision thereof, to the same extent, according to its value, as other real property is taxed."

subject, without exception, to all state and local general taxes on personal as well as real property:

"And the said associations or corporations shall severally be subject to State and municipal taxation upon their real and personal estate, the same as persons residing at their respective places of business are subject to such taxation by State laws." Cong. Globe, 38th Cong., 1st Sess., 1392 (1864).

The result of this conflict was that the legislation, when finally passed, was a compromise which permitted state taxation of national banks in certain ways, but prohibited all other forms of state taxation. Senator Fessenden, Chairman of the Finance Committee, clearly defined the compromise that was being enacted:

"If the Senator reads this bill he will perceive that all the power of taxation upon the operations of the bank itself, all upon the circulation, all upon the deposits, all upon everything which can properly be made by a tax is reserved to the General Government; that the States cannot touch it in any possible form; that they are limited and controlled; the simple right is given them to say that the property which their own citizens have invested in it shall contribute to State taxation precisely as other property." Cong. Globe, 38th Cong., 1st Sess., 1895 (1864).

It seems clear to us from the legislative history that 12 U. S. C. § 548 was intended to prescribe the only ways in which the States can tax national banks. And this is certainly not a novel interpretation of the section, as shown by previous decisions of this Court. As early as 1899 the Court declared:

"This section [R. S. § 5219, 12 U. S. C. § 548], then, of the Revised Statutes is the measure of the power of a State to tax national banks, their prop-

erty or their franchises. By its unambiguous pro-
visions the power is confined to a taxation of the
shares of stock in the names of the shareholders and
to an assessment of the real estate of the bank. Any
state tax therefore which is in excess of and not in
conformity to these requirements is void." *Owens-
boro Nat. Bank* v. *Owensboro,* 173 U. S. 664, 669.

A more complete explanation of § 548 and its meaning
appears in this Court's opinion in *Bank of California* v.
*Richardson,* 248 U. S. 476, where it was said:

"There is also no doubt from the section [R. S.
§ 5219, 12 U. S. C. § 548] that it was intended to
comprehensively control the subject with which it
dealt and thus to furnish the exclusive rule govern-
ing state taxation as to the federal agencies created
as provided in the section. . . .

"Two provisions in apparent conflict were adopted.
First, the absolute exclusion of power in the States
to tax the banks, the national agencies created, so
as to prevent all interference with their operations,
the integrity of their assets, or the administrative
governmental control over their affairs. Second,
preservation of the taxing power of the several States
so as to prevent any impairment thereof from arising
from the existence of the national agencies created,
to the end that the financial resources engaged in
their development might not be withdrawn from the
reach of state taxation . . . .

"The first aim was attained by the non-recognition
of any power whatever in the States to tax the fed-
eral agencies, the banks, except as to real estate
specially provided for, and, therefore, the exclusion
of all such powers. The second was reached by a
recognition of the fact that, considered from the
point of view of ultimate and beneficial interest,

every available asset possessed or enjoyed by the banks would be owned by their stockholders and would be, therefore, reached by taxation of the stockholders as such. . . ." 248 U. S., at 483.

Finally, so there can be no doubt, consider these words of the Court in *Des Moines Bank* v. *Fairweather,* 263 U. S. 103:

"This section [R. S. § 5219, 12 U. S. C. § 548] shows, and the decisions under it hold, that what Congress intended was that national banks and their property should be free from taxation under state authority, other than taxes on their real property and on shares held by them in other national banks; and that all shares in such banks should be taxable to their owners, the stockholders, much as other personal property is taxable . . . ." 263 U. S., at 107.

Thus, at least since the *Owensboro* decision, *supra,* in 1899, it has been abundantly clear that 12 U. S. C. § 548 marks the outer limit within which States can tax national banks. Now this Court is asked to change what legislative history and prior decisions have established is the precise meaning of an Act of Congress. This we cannot do. For, as we pointed out above, the banking field has traditionally been an area of particular congressional concern marked by legislation responsive to new problems. This can be illustrated by the history of § 548 alone. It was originally passed in 1864 because the 1863 Currency Act [4] contained no provision for state taxation of national banks or their shares. In 1868 a technical amendment was made to the section.[5] Then in 1923 a substantive amendment was made which, among other things, authorized the state taxation of national

---

[4] Act of February 25, 1863, c. 58, 12 Stat. 665.

[5] Act of February 10, 1868, c. 7, 15 Stat. 34.

bank income and dividends.[6]  Another important part of this amendment was the declaration that "bonds, notes, or other evidences of indebtedness" in the hands of individual citizens were not to be considered "moneyed capital . . . coming into competition with the business of national banks."  Just two years before, this Court had ruled in *Merchants' Nat. Bank of Richmond* v. *Richmond,* 256 U. S. 635 (1921), that such bonds and notes *were* moneyed capital in competition with national banks and thus covered by § 548.  Senator Pepper, who spoke for the amendment, made clear that it was offered as a response to this Court's decision which had placed an erroneous interpretation on the section.[7]  Then again in 1926, § 548 was amended to permit States to levy franchise and excise taxes on national banks measured by the entire income (including income from tax-exempt securities) of the banks.[8]  Finally, in 1950, a bill was sent to the Senate Committee on Banking and Currency which expressly permitted the levying of state sales and use taxes on national banks, but Congress did not pass it.[9]

Because of § 548 and its legislative history, we are convinced that if a change is to be made in state taxation of national banks, it must come from the Congress, which has established the present limits.

With this primary question out of the way, there is one additional issue which must be resolved.  The court below held, contrary to appellant's contention, that the Massachusetts sales tax is not imposed upon the bank as a purchaser, but is a tax upon vendors who sell tangible personal property to the bank.  Of course if

---

[6] Act of March 4, 1923, c. 267, 42 Stat. 1499.

[7] 64 Cong. Rec. 1454 (1923).

[8] Act of March 25, 1926, c. 88, 44 Stat. 223.

[9] See Hearing on S. 2547 before the Subcommittee on Federal Reserve Matters of the Senate Committee on Banking and Currency, 81st Cong., 2d Sess., 9 (1950).

this is true, the bank cannot object if a particular vendor decides to pass the burden of the tax on to it through an increased price. But if this is not true, and if the tax is on the bank as a purchaser, then, because it is a national bank, appellant is exempt under 12 U. S. C. § 548. Because the question here is whether the tax affects federal immunity, it is clear that for this limited purpose we are not bound by the state court's characterization of the tax. See *Society for Savings* v. *Bowers,* 349 U. S. 143, 151, and the cases cited therein. And essentially the question for us is: On whom does the incidence of the tax fall? See *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, 121–122. Also see *Carson* v. *Roane-Anderson Co.,* 342 U. S. 232.

It would appear to be indisputable that a sales tax which by its terms must be passed on to the purchaser imposes the legal incidence of the tax upon the purchaser. See *Federal Land Bank* v. *Bismarck Lumber Co.,* 314 U. S. 95, 99. Subsection 3 of the Massachusetts sales tax provides:

> "Reimbursement for the tax hereby imposed *shall be paid by the purchaser* to the vendor and each vendor in this commonwealth *shall add to the sales price and shall collect from the purchaser the full amount of the tax imposed by this section,* or an amount equal as nearly as possible or practicable to the average equivalent thereof; *and such tax shall be a debt from the purchaser to the vendor,* when so added to the sales price, and shall be recoverable at law in the same manner as other debts." Acts and Resolves, 1966, c. 14, § 1, subsec. 3. (Emphasis added.)

This subsection reads to us as a clear requirement that the sales tax be passed on to the purchaser. And this interpretation is reinforced by subsection 23 which pro-

hibits as unlawful advertising the holding out by any vendor that he will assume or absorb the tax on any sale that he may make. We cannot accept the reasoning of the court below that simply because there is no sanction against a vendor who refuses to pass on the tax (assuming this is true), this means the tax is on the vendor. There can be no doubt from the clear wording of the statute that the Massachusetts Legislature intended that this sales tax be passed on to the purchaser. For our purposes, at least, that intent is controlling. And it seems clear to us that the force of the law, especially the language in subsection 3, is such that, regardless of sanctions, businessmen will attempt, in their everyday commercial affairs, to conform to its provisions as written.

For these reasons we reverse and hold that appellant is immune from both the Massachusetts use and sales taxes.

*Reversed.*

Mr. Justice Fortas took no part in the consideration or decision of this case.

Mr. Justice Marshall, with whom Mr. Justice Harlan and Mr. Justice Stewart join, dissenting.

I would make clear that the Constitution of its own force does not prohibit Massachusetts from applying its uniform sales and use taxes to, among other things, appellant's wastebaskets.[1] It seems to me necessary to

---

[1] The *reductio ad absurdum* in the text is, unlike most, somewhat accurate. One item upon which, appellant informed its supplier, it should not have to pay the sales tax was a wastebasket (as well as, e. g., "1 Box 5 x 7 Index Cards"). The record does not reveal the extent of appellant's liability for use taxes; appellant paid a total of $575.66 in sales taxes for the three months of the year 1966 that are specifically at issue here.

decide that constitutional question in order properly to interpret 12 U. S. C. § 548, upon which the Court bases its decision. Moreover, the refusal to decide the issue gives further life to a largely outmoded doctrine.

Mr. Justice Brandeis rightly cautioned that "[i]n cases involving constitutional issues . . . this Court must, in order to reach sound conclusions, feel free to bring its opinions into agreement with experience and with facts newly ascertained, so that its judicial authority may . . . 'depend altogether on the force of the reasoning by which it is supported.' "[2]  I think that in light of the present functions and role of national banks they should not in this day and age be considered constitutionally immune from nondiscriminatory state taxation, and that § 548 should not be construed as giving them a statutory immunity from the taxes here involved.

## I.

*A.* The starting point of the constitutional inquiry is, of course, *M'Culloch* v. *Maryland,* 4 Wheat. 316 (1819). That case involved a state statute applicable to any bank established in Maryland "without authority from the State," *i. e.,* the Second Bank of the United States, chartered by Congress in 1816. It prohibited the circulation of notes (currency) by such a bank except on payment of a 2% stamp tax, or, alternatively, upon the payment annually to the State of $15,000. Substantial monetary penalties were provided for violations of the statute, for which the State had sued cashier M'Culloch. In a celebrated opinion Chief Justice Marshall, a principal architect of our federalism, struck down the Maryland statute.

---

[2] *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 412–413 (1932) (dissenting opinion), quoting from *Passenger Cases,* 7 How. 283, 470 (1849) (Taney, C. J.).

In *Osborn* v. *Bank of the United States,* 9 Wheat. 738 (1824), *M'Culloch* was applied to strike down an Ohio statute that attempted to extract an annual tax of $50,000 from each branch of a business operating in the State without its authority. The statutes found unconstitutional in both of those cases were patently discriminatory against the Second Bank of the United States (the Ohio statute specifically mentioned it), for the taxes did not apply to state-chartered banks. Chief Justice Marshall, however, did not limit his opinions in the two cases to discriminatory taxation, and they were applied by the Court in *Owensboro Nat. Bank* v. *Owensboro,* 173 U. S. 664 (1899), with little independent analysis to hold that Kentucky could not collect a nondiscriminatory franchise tax from a national bank. There was no discussion of the possible differences between federal functions performed by the kind of national bank involved there, which existed by virtue of legislation enacted in 1863 and 1864, and the quite distinct functions performed by the Second Bank of the United States involved in *M'Culloch* and *Osborn.*

Virtually all of the later cases in which national banks have been held to be federal instrumentalities immune from state taxation depend upon these three cases. One could, and perhaps should, read *M'Culloch* and *Osborn* simply for the principle that the Constitution prohibits a State from taxing discriminatorily a federally established instrumentality. On that view, Chief Justice Marshall's statement that "the power to tax involves the power to destroy," *M'Culloch* v. *Maryland, supra,* at 431, did not relate to a principle entirely necessary to the decision. As Mr. Justice Frankfurter pointed out in reference to what he called that "seductive *cliché*":

> "The web of unreality spun from Marshall's famous dictum was brushed away by one stroke of Mr.

Justice Holmes's pen: 'The power to tax is not the power to destroy while this Court sits.' " [3]

Absent an examination of the differences between the bank involved in *Owensboro* and the Second Bank of the United States involved in *M'Culloch* and *Osborn*, the *Owensboro* decision might be justified upon either of the following grounds: its alternative holding that the statute that is now § 548 constituted congressional delineation of the permissible scope of the power of the State to tax a national bank, or perhaps that the particular franchise tax was invalid as applied because it was based upon a valuation that included the national bank's required investment in nontaxable bonds of the United States.[4] Or one might view *Owensboro*, in holding a nondiscriminatory tax invalid, as simply incorrect.

Such a limited view of those hoary cases would, of course, require a re-evaluation of the validity of the doctrine of intergovernmental tax immunities—a doctrine which does not rest upon any specific provisions of the

---

[3] *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 489, 490 (1939) (concurring opinion), quoting from *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218, 223 (1928) (dissenting opinion).

[4] *Owensboro* might also be viewed simply as prohibiting a franchise tax, *i. e.*, as holding that a State may not condition the privilege to operate within its borders granted to the bank by Congress, by exacting that kind of tax. (Such a tax is permissible under 12 U. S. C. § 548, as amended after *Owensboro*, see *Tradesmens Nat. Bank* v. *Tax Comm'n*, 309 U. S. 560 (1940).) The taxes in *M'Culloch* and *Osborn*, apart from their discriminatory aspects, might be similarly viewed: the Maryland tax was directly upon the bank's operations, and alternatively upon its privilege to operate within the State; the Ohio tax in *Osborn* was also a condition upon the bank's privilege to transact business there. While the language and holdings of later cases go well beyond that limited view, that view would seem preferable to me to interpreting those constitutional decisions as flatly prohibiting all forms of state taxation, aside from exceptions listed in *M'Culloch*, 4 Wheat., at 436 (see *infra*, at 361).

Constitution, but rather upon this Court's concepts of federalism. See *M'Culloch* v. *Maryland, supra,* at 426; *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 487–492 (1939) (Frankfurter, J., concurring); T. Powell, Vagaries and Varieties in Constitutional Interpretation, c. IV (1956). I have no doubt that Congress could provide (and has provided, see *infra,* at 362) statutory immunity from state taxation for the federal instrumentalities it may establish. See, *e. g., United States* v. *City of Detroit,* 355 U. S. 466, 474 (1958); *Maricopa County* v. *Valley Nat. Bank,* 318 U. S. 357, 361 (1943); *Railroad Co.* v. *Peniston,* 18 Wall. 5, 37–38 (1873) (concurring in judgment). Given that congressional power, there is little reason for this Court to cling to the view that the Constitution itself makes federal instrumentalities immune from state taxation in the absence of authorizing legislation. The disparate kinds of instrumentalities and forms of state taxation create difficulties for *ad hoc* resolution of the immunity issue by this Court based only upon abstract concepts of federalism. See generally Powell, Waning of Intergovernmental Tax Immunities, 58 Harv. L. Rev. 633 (1945); Powell, Remnant of Intergovernmental Tax Immunities, 58 Harv. L. Rev. 757 (1945). As the Court has sometimes realized:

> "Wise and flexible adjustment of intergovernmental tax immunity calls for political and economic considerations of the greatest difficulty and delicacy. Such complex problems are ones which Congress is best qualified to resolve." *United States* v. *City of Detroit,* 355 U. S., at 474.

*B.* The Court has never indicated any great desire to reconsider *in toto* the doctrine of the constitutional immunity of federal instrumentalities from state taxation. The Court has, however, noted the trend in its decisions toward restricting "the scope of immunity [from taxes] of private persons seeking to clothe themselves with gov-

ernmental character," *Oklahoma Tax Comm'n* v. *Texas Co.*, 336 U. S. 342, 352 (1949). The wisdom of that trend counsels, I think, a rejection of the constitutional argument in this case.

As the Court said last Term, "there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality," *Department of Employment* v. *United States*, 385 U. S. 355, 358–359 (1966) (holding Red Cross immune). Various formulations of the controlling test have been used to determine whether institutions or individuals are immune: whether they "have been so incorporated into the government structure as to become instrumentalities of the United States and thus enjoy governmental immunity," *United States* v. *Boyd*, 378 U. S. 39, 48 (1964); whether they "are arms of the Government deemed by it essential for the performance of governmental functions," and "are integral parts of [a government department and] . . . share in fulfilling the duties entrusted to it," *Standard Oil Co.* v. *Johnson*, 316 U. S. 481, 485 (1942) (Army post-exchanges immune); whether they have been so "assimilated by the Government as to become one of its constituent parts," *United States* v. *Township of Muskegon*, 355 U. S. 484, 486 (1958); and whether the institution is regarded "virtually as an arm of the Government," *Department of Employment* v. *United States, supra,* at 359–360.

Under those general rubrics, the Court has looked to various specific factors and characteristics to determine the status of the specific institution: whether it is organized for private profit, and whether the Government has retained such control over it so that "it could properly be called a 'servant' of the United States in agency terms," *United States* v. *Township of Muskegon, supra,* at 486; whether it was organized to effectuate a spe-

cific governmental program, *Federal Land Bank of St. Paul* v. *Bismarck Lumber Co.,* 314 U. S. 95, 102 (1941); whether its ownership, substantially or totally, lies in the Government, *Clallam County* v. *United States,* 263 U. S. 341, 343 (1923); *Railroad Co.* v. *Peniston,* 18 Wall., at 32; whether government officials handle and control its operations, *Standard Oil Co.* v. *Johnson, supra;* whether its officers or any significant portion of them are appointed by the Government, *Department of Employment* v. *United States, supra;* compare *Railroad Co.* v. *Peniston, supra;* whether the Government gives it significant financial aid, whether it is charged by law with carrying out some of the Government's international commitments, and whether it performs "functions indispensable to the workings" of a governmental unit, *Department of Employment* v. *United States, supra,* at 359.

Under any of those rubrics and applying the factors listed above—a list not intended to be exhaustive—a national bank cannot be considered a tax-immune federal instrumentality. It is a privately owned corporation existing for the private profit of its shareholders. It performs no significant federal governmental function that is not performed equally by state-chartered banks. Government officials do not run its day-to-day operations nor does the Government have any ownership interest in a national bank.

Appellant points to two factors as leading to the conclusion that national banks are federal instrumentalities: that they "owe their very existence to congressional legislation," and that they are subject to extensive federal regulation. But the fact that institutions "owe their existence to," *i. e.,* are chartered by, the Government, has been definitely rejected as a basis alone for determining they should be tax immune. *Railroad Co.* v. *Peniston, supra;* cf. *Broad River Power Co.* v. *Query,* 288 U. S. 178 (1933). Similarly, a whole host of businesses and

institutions are subject to extensive federal regulation and that has never been thought to bring them within the scope of the "federal instrumentalities" doctrine. The plain fact is that one could hold that national banks have a constitutional tax-immune status today only by mechanically applying the three seminal cases of *M'Culloch, Osborn,* and *Owensboro.* It is instructive, therefore, to examine the functions performed by the national banks involved in those cases.

The Second Bank of the United States, involved in *M'Culloch* and *Osborn,* would clearly be a federal instrumentality under the Court's most recent discussion of the doctrine (*Department of Employment, supra*): the United States owned 20% of its capital stock (the remainder being owned by private persons); the President appointed five of its 25 directors, and the Government, as a shareholder, participated in the election of the others; the Secretary of the Treasury was required to deposit all of the public funds in the bank, unless he could give reasons to Congress why he should not do so; the bank was required to transmit funds for the United States without charge; the bank issued currency which was established as legal tender for all debts owing to the Government; and the bank clearly acted as the fiscal agent of the Government, handling its foreign exchange transactions. See P. Studenski & H. Krooss, Financial History of the United States 83–88, 103–106 (2d ed. 1963); Federal Reserve System, Banking Studies 7–8, 18, 39–41 (1941).

Even the national bank involved in *Owensboro* might warrant tax-immune status were it in existence today. It was established pursuant to the National Currency Acts of 1863 and 1864 [5] which were enacted largely to

[5] Act of February 25, 1863, 12 Stat. 665 ("An Act to provide a national Currency . . ."); Act of June 3, 1864, 13 Stat. 99 ("An Act to provide a National Currency . . .").

bolster the Union's financial status, shaky because of the Civil War. Banking Studies, *supra,* at 43–46. Most importantly, from the standpoint of analyzing the federal functions such banks served, national banks under the Civil War legislation,[6] to which national banks today trace their history, had important and significant functions concerning currency. They were authorized to issue currency, printed for them by the Treasury Department, and such currency was established as legal tender for all debts owing to, or payable by, the Government. To insure the stability of the national currency by insuring the stability of the issuing banks, as well as to provide a ready market for the Government, each such national bank was required to secure its currency by depositing United States bonds with the Treasury Department. Banking Studies, *supra,* 14–16, 41–46; Studenski & Krooss, *supra,* 154–155.

All of this was radically changed with the passage of the Federal Reserve Act of 1913, 38 Stat. 251, as amended, 12 U. S. C. § 221 *et seq.,* and by subsequent developments with respect both to the Federal Reserve System and to national banks. To capsulize those developments greatly, suffice it to say that the Federal Reserve banks (and System) are now the monetary and fiscal agents of the United States. 12 U. S. C. § 391. By 1935, the power of national banks to issue currency had ceased and now Federal Reserve banks are the only banking institutions that can do so. Banking Studies, *supra,* at 240; Federal Reserve System, The Federal Reserve System: Purposes and Functions c. X (5th rev. ed. 1967). The diminished importance of national banks as federal functionaries was compensated for by the enactment of legislation designed to make them more competitive with state banks, *e. g.,*

---

[6] See n. 5, *supra;* see also revenue acts, Act of March 3, 1865, §§ 6, 7, 13 Stat. 484; Act of July 13, 1866, § 9, 14 Stat. 146.

branch banking, 44 Stat. 1228 (1927), as amended, 12 U. S. C. § 36 (c); fiduciary powers, 76 Stat. 668 (1962), 12 U. S. C. § 92a; rate of interest on loans, 48 Stat. 191 (1933), as amended, 12 U. S. C. § 85; capitalization, 48 Stat. 185 (1933), 12 U. S. C. § 51; and interest on time and savings deposits, 44 Stat. 1232 (1927), 12 U. S. C. § 371.

To be sure, the Federal Reserve System could not function without national banks, which are required to be members therein, 12 U. S. C. § 222, and in that sense they are part and parcel of the establishment and effectuation of the national fiscal and monetary policies. But, in my view, that does not make them sufficiently quasi-public to enjoy the tax-immune status of federal instrumentalities. If that alone were enough, then it would seem that state banks which elect to join the Federal Reserve System should also be tax-immune federal instrumentalities.[7]

In any event, there is little difference today between a national bank and its state-chartered competitor: the ownership, control and capital source of each is private; each exists for private profit. More importantly, neither may issue legal tender:

> "With the passing of the national bank notes, the United States lost much of the difference between the national banking system and the state banking systems. Except for automatic membership in the Federal Reserve System, different examining boards, and more or less different standards of examination, appraisal, and the like, the main point of differentiation between the national banking system and any [state] . . . banking system . . . was formerly the

---

[7] As of December 31, 1966, membership in the Federal Reserve System was composed of 1,351 state-chartered, and 4,799 national, banks. The Federal Reserve System: Purposes and Functions, *supra,* at 24–25.

privilege of currency issue." J. Paris, Monetary Policies of the United States, 1932–1938, at 96 (1938).

Today the national banks perform no significant fiscal services to the Federal Government not performed by their state competitors. Any federally insured bank, state or national, may be a government depository. 12 U. S. C. § 265. The principal checking accounts of the Government are carried today, not by national banks, but by the Federal Reserve banks. When a new issue of government securities is offered, the Federal Reserve banks receive the applications of purchasers. When government securities are to be redeemed or exchanged, the transactions are handled by the Federal Reserve banks. Those banks administer for the Treasury the tax and loan deposit accounts of the banks in their respective districts. See The Federal Reserve System: Purposes and Functions, *supra*, at 225–234, 274–277; Banking Studies, *supra*, 260–265.

In *Graves* v. *New York ex rel. O'Keefe,* 306 U. S., at 483, Mr. Justice Stone wrote for the Court:

"[T]he implied immunity of one government and its agencies from taxation by the other should, as a principle of constitutional construction, be narrowly restricted. For the expansion of the immunity of the one government correspondingly curtails the sovereign power of the other to tax, and where that immunity is invoked by the private citizen it tends to operate for his benefit at the expense of the taxing government and without corresponding benefit to the government in whose name the immunity is claimed." [8]

That is precisely the situation here; I would heed those words and hold that national banks, today, are not

[8] Accord, *Indian Motorcycle Co.* v. *United States,* 283 U. S. 570, 580 (1931) (Stone, J., dissenting).

immune from nondiscriminatory state taxation as federal instrumentalities.[9] I might also add that I am a bit mystified that under the Court's decisions in this field the Federal Government in practical effect must pay a state tax in dealing with its contractors (who pass the tax on to the Government), see, e. g., *Alabama* v. *King & Boozer*, 314 U. S. 1 (1941), but that a national bank, a private profit-making corporation, is constitutionally immune from state taxation.

## II.

The Court holds that 12 U. S. C. § 548, *ante*, at 341, n. 3, "was intended to prescribe the only ways in which the States can tax national banks." *Ante*, at 343. I would be less than candid not to acknowledge that that holding has the virtue of being supported by substantial precedent. But that seems to me to be its only virtue. That interpretation of § 548 has its judicial origin in the *Owensboro* case. Given the constitutional premise of *Owensboro*, that interpretation would be quite clearly correct. But since I reject the constitutional premise so far as national banks today are concerned, it seems to me § 548 ought to be examined freshly, for the "immunity formerly said to rest on constitutional implication [should not] . . . now be resurrected in the form of statutory implication." *Oklahoma Tax Comm'n* v. *United States*, 319 U. S. 598, 604 (1943).

Section 548 expressly mentions four specified types of taxes: those on national bank shares, on dividends on shares in the hands of stockholders, on the income of the

---

[9] Compare the rejection of a national bank's contention that it, as a federal instrumentality, should be exempt from the federal labor laws, *NLRB* v. *Bank of America*, 130 F. 2d 624, 627 (C. A. 9th Cir. 1942) (footnote omitted):

"It is a privately owned corporation, privately managed and operated in the interest of its stockholders. . . . The United States did not create it, but has merely enabled it to be created. . . ."

bank, and taxes "according to or measured by" a bank's income. It provides that the imposition of any one of the four listed taxes "shall be in lieu of the others." That statement, together with language of the section omitted in the Court's note as not pertinent (*ante,* at 341–342, n. 3),[10] makes clear that the purpose of the section was to

---

[10] The relevant omitted portions of § 548 read:

"1. (a) . . .

"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: *Provided,* That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section.

"(c) In case of a tax on or according to or measured by the net income of an association, the taxing State may, except in case of a tax on net income, include the entire net income received from all sources, but the rate shall not be higher than the rate assessed upon other financial corporations nor higher than the highest of the rates assessed by the taxing State upon mercantile, manufacturing, and business corporations doing business within its limits: *Provided, however,* That a State which imposes a tax on or according to or measured by the net income of, or a franchise or excise tax on, financial, mercantile, manufacturing, and business corporations organized under its own laws or laws of other States and also imposes a tax upon the income of individuals, may include in such individual income dividends from national banking associations located within the State on condition that it also includes dividends from domestic corporations and may likewise include dividends from national banking associations located without the State on condition that it also includes dividends from foreign corporations, but at no higher rate than is imposed on dividends from such other corporations.

"(d) In case the dividends derived from the said shares are taxed, the tax shall not be at a greater rate than is assessed upon the net income from other moneyed capital.

"2. The shares of any national banking association owned by nonresidents of any State shall be taxed by the taxing district or

insure the competitive equality of the banks with other businesses by preventing the bank or its shareholders from being subjected to more than one of the four enumerated types of taxes, other than real property taxes, so as to prevent multiple taxation of the same income, unless the States taxed the income of other businesses in similar multiple fashion. See 12 U. S. C. § 548, subsections 1 (b), (c), and (d), *supra*, n. 10. All that the majority can point to in the legislative history of § 548 is that the Congress was well aware of *M'Culloch* v. *Maryland*. And that decision specifically stated the following:

> "This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State." (4 Wheat., at 436.)

I view § 548 as congressional delineation of those areas of state taxation of national banks permitted by the *M'Culloch* decision itself. I would hold that the section was "merely designed to insure that the inherent taxing powers which were recognized in" that case—"e. g., the power to tax the real property of the banks as well as the privately owned shares—be exercised in a non-discriminatory fashion." *Liberty Nat. Bank* v. *Buscaglia*, 21 N. Y. 2d 357, 370, 235 N. E. 2d 101, 108 (1967). As this Court said in *Tradesmens Nat. Bank* v. *Oklahoma Tax Comm'n*, 309 U. S. 560, 567 (1940), "the various restrictions [§ 548] . . . places on the permitted meth-

---

by the State where the association is located and not elsewhere; and such association shall make return of such shares and pay the tax thereon as agent of such nonresident shareholders."

ods of taxation are designed to prohibit only those systems of state taxation which discriminate in practical operation against national banking associations or their shareholders as a class."

Moreover, whatever else may be said of the statute, it most assuredly does not provide specifically that it is the sole measure of the State's power of taxation. One could argue that, given the state of constitutional law as it then existed, Congress saw no need to say specifically in § 548 that national banks were immune from state taxation except as that section permitted. Aside from the misreading of *M'Culloch* that such a view entails, the constitutional immunity of federal instrumentalities was just as plain when Congress provided statutory immunity for such agencies as, *e. g.,* the Federal Reserve banks, 38 Stat. 258 (1913), 12 U. S. C. § 531; Federal land banks, 39 Stat. 380 (1916), 12 U. S. C. § 931; many other federal banking institutions; [11] the Reconstruction Finance Corporation, 47 Stat. 9 (1932), 15 U. S. C. § 607; and the Public Housing Administration, 50 Stat. 890 (1937), 42 U. S. C. § 1405 (e), and a host of government-owned corporations.[12]

It is not without relevance in construing § 548, it seems to me, that the kinds of state taxes here involved did not exist at the time the section was adopted and were not a significant factor in the raising of state revenue until the early 1930's, subsequent to the last amendment of § 548 in 1926. See generally H. R. Rep. No. 565, 89th Cong., 1st Sess., 608 (1965). I think we should be reluctant to interpret a statute having such narrow

---

[11] *E. g.,* federal intermediate credit banks, 12 U. S. C. § 1111; Federal Home Loan Bank, 12 U. S. C. § 1433; federal savings and loan associations, 12 U. S. C. § 1464 (h).

[12] *E. g.,* Federal Deposit Insurance Corp., 12 U. S. C. § 1825. See Government Corporation Control Act of 1945, 59 Stat. 597, as amended, 31 U. S. C. § 841 *et seq.*

scope as § 548 as encompassing such a broad prohibitory application. It seems to me that we would do far better to recognize that the Constitution does not prohibit nondiscriminatory state taxation of national banks, and that § 548 limits only the kinds of taxes specifically set forth therein. Only in that way is Congress free to re-evaluate the situation. That is, so far as construing § 548 is concerned, in practical effect the issue is who shall bear the burden of seeking congressional action. I would put the burden where it ought to be, namely, on the private profit-making corporation that seeks exemption from nondiscriminatory state taxation.

Finally, a major national banking policy has been to foster competitive equality of national and state banks. See, *e. g., First Nat. Bank* v. *Walker Bank,* 385 U. S. 252 (1966); *Lewis* v. *Fidelity & Deposit Co.,* 292 U. S. 559 (1934). We ought, if other considerations are not decisive, to promote rather than retard that strong policy.

For the reasons stated, I would affirm.

MR. JUSTICE HARLAN: In addition to the reasons given in my Brother MARSHALL's opinion, which I have joined, I would affirm the judgment below on the basis of that part of Justice Reardon's opinion for the Supreme Judicial Court of Massachusetts which upheld the application of Massachusetts' use tax to national banks. See —— Mass. ——, —— – ——, 229 N. E. 2d 245, 251–260.