**UNITED STATES of America; and Crocker National Bank, a National Banking Association, Plaintiffs–Appellants,**

v.

**STATE BOARD OF EQUALIZATION, an agency of the State of California, an agent of the Cities, Cities and Counties, and Counties of California, an agent of the San Francisco Bay Area Rapid Transit District, and an agent of the Southern California Rapid Transit District, Defendant–Appellee.**

No. 78–2899.

United States Court of Appeals, Ninth Circuit.

Argued July 11, 1980.

Submitted Aug. 4, 1980.

Decided Oct. 23, 1980.

Franklin C. Latcham, Morrison & Foerster, San Francisco, Cal., for plaintiffs–appellants.

Timothy G. Laddish, San Francisco, Cal., for defendant–appellee.

Before TRASK and CHOY, Circuit Judges, and SMITH,* District Judge.

CHOY, Circuit Judge:

The United States and Crocker National Bank (Crocker) appeal from the district court's order granting summary judgment in favor of the State Board of Equalization (Board). The district court ruled that the 1969 temporary amendment to § 5219 of the Revised Statutes of the United States permitted the Board to impose its state and local sales taxes on sales of tangible personal property to national banks between December 24, 1969, and December 31, 1972. We affirm.

## I. BACKGROUND

Over 160 years ago, in the historic case of *McCulloch v. Maryland*, 17 U.S. 315, 4 Wheat. 316, 4 L.Ed.2d 579 (1819), the Supreme Court declared national banks constitutionally immune from state taxation. Since 1864, however, Congress has waived that immunity by statute and permitted certain forms of state taxation. *See* Act of June 3, 1864, c. 106, § 41, 13 Stat. 99, 111–12. Although the Supreme Court more recently has declined to decide whether, under present–day conditions, national banks should still be considered nontaxable as federal instrumentalities, the Court nonetheless has affirmed the rule that states may tax national banks only as specifically permitted by Congress. *First Agricultural National Bank v. State Tax Commission*, 392 U.S. 339, 341–46, 88 S.Ct. 2173, 2174–77, 20 L.Ed.2d 1138 (1968).

* The Honorable Russell E. Smith, Senior United States District Judge for the District of Montana, sitting by designation.

## A. Taxation of National Banks in California

Prior to December 24, 1969, Congress had allowed state taxation of national banks in any one of four specified ways in addition to taxes on their real property. Rev.Stat. § 5219 (current version at 12 U.S.C. § 548.) [1] In 1928, California chose the fourth method, a franchise tax based on net income. Cal. Const. art. XIII, § 16 (current version at Cal.Const. art. XIII, § 27). This franchise tax, applicable both to state banks and national banks, was "in lieu of all other taxes, and licenses, state, county and municipal, upon the said banks except taxes upon their real property." Cal.Rev. & Tax.Code § 23182.

In 1938, the California Supreme Court held that the incidence of the state sales tax, enacted in 1933, was on the retailer and not the purchaser and that therefore sales tax could be imposed on sales of tangible personal property *to* national banks. *Western Lithographic Co. v. State Board of Equalization,* 11 Cal.2d 156, 78 P.2d 731, 737 (1938). Concomitantly, sales tax could not be imposed on sales of tangible personal property *by* banks because such a tax would be on the banks as retailers and not of a type allowed by § 5219. The Court based this decision on its analysis of the intent of the California legislature in enacting the sales tax. 78 P.2d at 734–35.

Because non–bank corporations in California paid personal property taxes in addition to a franchise tax on their income, California attempted to equalize the respective tax burdens of banks and non–banks by applying a built–up rate of the franchise tax to banks. This built–up rate was based on the ratio between the average amount of

personal property taxes paid by non–banks and their average net income.

## B. The 1969 Amendment to § 5219

In 1968, the Supreme Court in *First Agricultural National Bank v. Tax Commission,* 392 U.S. 339, 346–48, 88 S.Ct. 2173, 2177–78, 20 L.Ed.2d 1138 (1968), held that the incidence of a newly–enacted Massachusetts sales tax was on the purchaser, for federal purposes, and thus the tax could not be imposed on sales of tangible personal property to national banks. The following year, the Court struck down sales and other taxes imposed on national banks by the state of Florida. *Dickinson v. First National Bank,* 393 U.S. 409, 89 S.Ct. 685, 21 L.Ed.2d 634 (1969). These decisions created great difficulties for states in their attempts to equalize the tax burdens of banks and other businesses and led to the enactment of Pub. L.No.91–156, 83 Stat. 434 (1969), which amended § 5219.

In its report accompanying that bill, the Senate Banking and Currency Committee observed:

> There may have at one time been justification for giving national banks privileges and immunities which were denied State banks, under the theory that national banks are peculiarly an instrumentality of the Federal Government, and, as such, hold a unique and distinct position from that of other institutions. Without specifically addressing the question of whether national banks remain, in substance, such a Federal instrumentality, the committee is agreed that there is no longer any justification for Congress continuing to grant national banks immunities from State taxation which are not afforded State banks.

> 1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others . . . .

> . . . . .

> 3. Nothing herein shall be construed to exempt the real property of associations from taxation in any State or in any subdivision thereof, to the same extent, according to its value, as other real property is taxed.

1. This section provided in pertinent part:

 The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income . . . .

S.Rep.No.91–530, 91st Cong., 1st Sess. 2, *reprinted in* [1969] U.S.Code Cong. & Admin.News, pp. 1594, 1595.

Therefore, Congress, in Pub.L.No.91–156, completely revised § 5219 to permit states to tax national banks as state banks, effective January 1, 1972 (later amended to January 1, 1973).[2]

During the bridge period, from December 24, 1969 through December 31, 1972, the temporary amendment provisions of Pub.L. No.91–156, §§ 1 & 3, applied. Subsection 1(a) required nondiscrimination between banks and non–banks and between state banks and national banks. Subsection 1(b) provided limitations on state taxation of national banks not having their principal offices in the state. Subsection 3(a) provided that no tax could be imposed on a national bank unless (1) it was already imposed before December 24, 1969, or (2) the state legislature, by affirmative action, enacted the tax after December 23, 1969. Subsection 3(b) provided that, notwithstanding the requirements of § 3(a), certain specified taxes, including sales tax, could automatically be imposed without affirmative legislative action if the state did not already "impose a tax, or an increased rate of tax, in lieu thereof."

The California legislature did not take any affirmative action. But because the sales tax was not considered to be on the purchaser the Board continued during the bridge period to impose the sales tax on sales of tangible personal property *to* national banks, but not on sales *by* national banks.

2. Pub.L.No.91–156 provides in part:

§ 1. Temporary amendment of section 5219, Revised Statutes

(a) Section 5219 of the Revised Statutes (12 U.S.C. 548) is amended by adding at the end thereof the following:

"5. (a) In addition to the other methods of taxation authorized by the foregoing provisions of this section and subject to the limitations and restrictions specifically set forth in such provisions, a State or political subdivision thereof may impose any tax which is imposed generally on a nondiscriminatory basis throughout the jurisdiction of such State or political subdivision (other than a tax on intangible personal property) on a national bank having its principal office within such State in the same manner and to the same extent as such tax is imposed on a bank organized and existing under the laws of such State.

"(b) Except as otherwise herein provided, the legislature of each State may impose, and may authorize any political subdivision thereof to impose, the following taxes on a national bank not having its principal office located within the jurisdiction of such State, if such taxes are imposed generally throughout such jurisdiction on a nondiscriminatory basis:

. . . . .

(b) The amendment made by subsection (a) of this section shall be effective from the date of enactment of this Act until the effective date of the amendment made by section 2(a) of this Act.

§ 2. Permanent amendment of section 5219, Revised Statutes

(a) Section 5219 of the Revised Statutes (12 U.S.C. 548) is amended to read:

"Sec. 5219. For the purposes of any tax law enacted under authority of the United States or any State, a national bank shall be treated as a bank organized and existing under the laws of the State or other jurisdiction within which its principal office is located.

(b) The amendment made by subsection (a) becomes effective on January 1, 1972 [later amended to January 1, 1973].

§ 3. Saving provision

(a) Except as provided in subsection (b) of this section, prior to January 1, 1972, no tax may be imposed on any class of banks by or under authority of any State legislation in effect prior to the enactment of this Act unless

(1) the tax was imposed on that class of banks prior to the enactment of this Act, or

(2) the imposition of the tax is authorized by affirmative action of the State legislature after the enactment of this Act.

(b) The prohibition of subsection (a) of this section does not apply to

(1) any sales tax or use tax complementary thereto,

(2) any tax (including a documentary stamp tax) on the execution, delivery, or *recordation of documents, or*

(3) any tax on tangible personal property (not including cash or currency), or for any license, registration, transfer, excise or other fee or tax imposed on the ownership, use or transfer of tangible personal property,

imposed by a State which does not impose a tax, or an increased rate of tax, in lieu thereof.

. . . . .

## C. *Diamond National*

In 1976, the Supreme Court expressly overruled the California court's construction of the state sales tax law. *Diamond National Corp. v. State Board of Equalization*, 425 U.S. 268, 96 S.Ct. 1530, 47 L.Ed.2d 780 (1976). The Supreme Court held that, for purposes of federal law, the incidence of California's sales tax was on the purchaser and thus could not legally have been imposed on sales of tangible personal property to national banks before December 24, 1969. *Id.* at 268, 96 S.Ct. at 1530.

Accordingly, the Board refunded sales taxes collected from sales of tangible personal property to national banks before December 24, 1969. With regard to the bridge period, however, the Board maintained that § 3(b) of Pub.L.No.91–156 allowed the automatic imposition of California's sales tax as one "imposed by a State which does not impose a tax, or an increased rate of tax, in lieu thereof." Therefore, the Board refused to refund sales taxes for that period. This suit followed.

## II. *DISCUSSION*

The parties agree that California's sales tax could not be imposed on sales of tangible personal property to national banks before December 24, 1969. *Diamond National* is dispositive of this point. Thus, subsection 3(a)(1) of Pub.L.No.91–156 is inapplicable. It is also agreed that the California legislature took no affirmative action to authorize such a tax after December 24, 1969. Thus, § 3(a)(2) is also inapplicable. Therefore, the sole issue in this case is whether California's sales tax on sales of tangible personal property to national banks was a tax "imposed by a State which does not impose a tax or an increased rate of tax, in lieu thereof" within the meaning of § 3(b).

The Board contends, and the district court ruled, that (1) Congress intended in § 3(b) that state tax laws be considered to determine whether a tax, or an increased rate of tax, was actually imposed in lieu of the specific tax sought to be imposed automatically under § 3(b); and (2) the built–up rate of California's bank franchise tax was not actually imposed in lieu of the sales tax on sales of tangible personal property to national banks. We agree with both conclusions.

## A. *Consideration of State Law in Applying § 3(b)*

Crocker contends that it was error to consider state law in applying § 3(b). A federal test alone must be used when applying a federal statute regarding state taxation of national banks, argues Crocker, citing *First Agricultural National Bank*, 392 U.S. at 347, 88 S.Ct. at 2177, and *Chase Manhattan Bank v. Finance Administration*, 440 U.S. 447, 99 S.Ct. 1201, 59 L.Ed.2d 445 (1979). Using this approach, Crocker generates the following syllogism:

California's bank franchise tax was in lieu of all other taxes (except real property taxes) on national banks. According to *Diamond National*, a sales tax on sales to national banks is a tax on national banks. Therefore, the franchise tax was imposed in lieu of the sales tax and the sales tax is not permitted by § 3(b).

The cases cited by Crocker, however, do not support the broad proposition advanced by Crocker and they do not preclude consideration of state law in the application of § 3(b). The issue in *First Agricultural* was whether the Massachusetts sales tax on sales to national banks was a tax on the banks for purposes of § 5219. 392 U.S. at 346–47, 88 S.Ct. at 2177. *Diamond National* involved the same issue with regard to California's sales tax. 425 U.S. at 268, 96 S.Ct. at 1530. Here, it is conceded that California's sales tax is a tax on the banks; the only question is whether the franchise tax was "in lieu thereof." Thus, we are not faced with a choice between federal and state incidence tests, as Crocker suggests. There is no incidence issue involved here.

In *Chase Manhattan Bank*, there were two issues involving Pub.L.No.91–156. The first was whether the New York legislature had authorized the imposition of the state commercial rent and occupancy tax by "affirmative action" as required by § 3(a)(2).

440 U.S. at 448, 99 S.Ct. at 1202. That subsection is not at issue in this case; as already mentioned, all parties agree that the California legislature took no affirmative action.

The second issue in *Chase Manhattan* was whether New York's commercial rent and occupancy tax was a "tax on tangible personal property" within the meaning of § 3(b)(3). The New York Court of Appeals had held that it was. But the Supreme Court held this to be a question of federal law and concluded from a facial analysis of Pub.L.No.91–156 that Congress did not consider real estate occupancy taxes to be taxes on tangible personal property. *Id.* at 449, 99 S.Ct. at 1202. Here, however, it has already been established by *Diamond National* that, for federal purposes, California's tax on sales to national banks is indeed a sales tax on national banks. 425 U.S. at 268, 96 S.Ct. at 1530. Thus, the California sales tax is within § 3(b)(1). The *Chase Manhattan* Court did not reach the question we now face in this case, *i. e.*, what Congress meant in § 3(b) by "in lieu thereof."

■ The teachings of *First Agricultural* and *Chase Manhattan*—that a federal test must be used to determine the incidence and type of a state tax for federal purposes—do not preclude consideration of state law to determine if California's bank franchise tax was imposed in lieu of the sales tax on sales to national banks. An analysis of both the language and the legislative history of Pub.L.No.91–156 in general, and § 3(b) in particular, indicates that Congress did intend that state tax law be considered.

### 1. *Facial analysis of § 3(b)*

As with any exercise of statutory construction, our starting point is the face of the statute itself. Subsection 3(b)(1)–(3) lists three types of taxes, including sales tax, which may be imposed automatically—*i. e.*, without affirmative legislative action—by any state that does not already impose another tax, or an increased rate of tax, "in lieu thereof."

We think the most natural reading of the language of § 3(b) is the one given to it by the district court—"in lieu thereof" means "actually in lieu of those specific taxes listed in § 3(b)(1)–(3)." Under this interpretation, an analysis of California's taxing structure is necessary to determine whether the built–up rate of the bank franchise tax was in fact imposed in lieu of the sales tax on sales to national banks.

Crocker interprets § 3(b) to permit the automatic imposition of a sales tax only where a state does not impose any form of "in lieu" tax, whether or not that tax is actually in lieu of the sales tax. But each of the four types of taxes permitted by § 5219 before 1969 were required to be in lieu of the others, § 5219(1)(a); and states could impose no tax other than one of those four types (except real property taxes), *First Agricultural*, 392 U.S. at 343, 88 S.Ct. at 2175. Thus, Crocker would have us read § 3(b) to mean that the three taxes listed in § 3(b)(1)–(3) could be imposed automatically only by a state that had no tax whatsoever (other than real property taxes) on national banks.[3] We agree with the district court

3. Crocker insists that its argument is not so broad. Crocker suggests that § 3(b) would still be available in a state that had a § 5219 tax if that tax were "narrowly worded." For instance, Arizona's § 5219 tax, codified at Ariz. Rev.Stat.Ann. § 42–901, was also a tax based on the net income of national banks. But unlike California's bank franchise tax, which was "in lieu of all other taxes" on national banks, the Arizona tax was, by its terms, "in lieu of any tax on the shares of stock or net income" of national banks. Ariz.Rev.Stat.Ann. § 42–902. Because a sales tax is not a tax on "the shares of stock or net income" of national banks, Crocker argues that the Arizona § 5219

tax would not be "in lieu of" a sales tax. Thus, § 3(b) would still be applicable in a state with a § 5219 tax like Arizona's. This analysis, however, ignores the basic structure of § 5219. The imposition of any of the four types of taxes permitted by § 5219 was required by that statute to be in lieu of the other three types. § 5219(1)(a). The language of the Arizona statute simply reflects that requirement. Furthermore, § 5219 was intended to prescribe the *only* ways in which states could tax national banks; no other tax may be imposed. *First Agricultural*, 392 U.S. at 343, 88 S.Ct. at 2175. Thus, no matter how "narrowly worded" a

that this strained interpretation deprives much of the language of § 3(b) of any significance. If Congress had intended this meaning, it need not have included the words "in lieu thereof" in § 3(b). Nor would any reference to "an increased rate of tax" be necessary if § 3(b) could apply only where no tax at all was imposed. In order for its theory to prevail, Crocker must point to a clear indication in the legislative history of § 3(b) that Congress intended this unusual construction.

## 2. *Legislative history*

■ The legislative history, however, belies Crocker's approach and confirms the district court's interpretation of § 3(b). The general purpose of Pub.L.No.91–156 was to promote equality in state taxation of state banks vis–a–vis national banks, and banks vis–a–vis non–bank corporations. S.Rep.No.91–530, 91st Cong., 1st Sess. 2, *reprinted in* [1969] U.S.Code Cong. & Admin.News, pp. 1594, 1594–95. Hence, its objective was to allow each state "the greatest possible degree of autonomy with regard to the formulation of its tax structure." *Id.* at 1595. But because some states had already adopted built–up rates and other formulas in attempts to equalize tax burdens, the danger of unintended double taxation was seen in an immediate lifting of all restrictions:

> If by congressional action banks were automatically subject to taxes which they had not been previously paying, in addition to the taxes which they are now paying, the effect may be to destroy the degree of equality that the state legislature, by conscious effort, attempted to achieve.

*Id.* at 1599. Therefore, the affirmative action requirement of § 3(a)(2) was included. *Id.*

In order to avoid needless expense to the states this restriction was further refined in § 3(b) to permit automatic imposition of certain specified forms of taxes, including sales taxes, where other taxes or built–up rates were not already imposed "in lieu thereof." These specified taxes were referred to as "newer" forms of taxes because, although common in 1969, they were for the most part unknown in 1926 when § 5219 was last amended. Thus, automatic imposition of these newer taxes would not present any danger of double taxation in the usual case. *See id.* at 1600 (Individual views of Mr. Tower). Consistent with the purpose of avoiding double taxation, the references to § 3(b) reflect an understanding that those newer taxes that were not already actually compensated for in another tax or built–up rate would be exempted from the affirmative action requirement. *See* Hearings on S. 2065, S. 2096, and H.R. 7491 before the Senate Comm. on Banking and Currency, 91st Cong., 1st Sess. 41 (recommending automatic imposition except where taxes "in lieu of personal property and sales taxes" were already imposed); *id.* at 43 (American Bankers Association proposal permitting automatic taxes except for taxes "in lieu of which" other taxes were imposed); *id.* at 54 (referring to higher franchise tax rate " 'in lieu of' several taxes" to which banks were then not subject); *id.* at 58 (automatic provision should exclude taxes for which the state had substituted another tax); S.Rep.No.91–530, 91st Cong., 1st Sess. 7–8, *reprinted in* [1969] U.S.Code Cong. & Admin.News, pp. at 1600 (new tax should not be automatically imposed by state which imposed an increased rate of tax "in lieu of such new tax") (individual views of Mr. Tower). *But see* Hearings at 51 (suggesting that American Bankers Association proposal would prohibit levying new tax if an "in lieu" tax is imposed) (statement by New York Superintendent of Banks on behalf of National Institute of Supervisors of Banks).

An examination of the state taxing structure would be necessary to determine whether a given tax was already compensated for by another state tax. This seems

---

state's § 5219 tax might be, for federal purposes, any § 5219 tax must be construed to be

"in lieu of all others." *See id.* at 346–47, 88 S.Ct. at 2177.

to have been the understanding of Senator Proxmire, the Senate floor manager of the bill. Asked by another senator if § 3(b) would permit the automatic imposition of sales tax and certain other taxes and under what circumstances, Senator Proxmire replied:

> The Senator is correct in his understanding.
>
> .　　.　　.　　.　　.
>
> I am unable to describe the precise effect this act will have on the mechanism of the tax laws of each State. Those laws are extremely complex, and require experts on the law of each State to determine what action, if any, will be required by each State in order to take advantage of the act.

115 Cong.Rec. 38633–34.

We conclude from all this that Congress did intend, as the most natural reading of the face of the statute implies, that state law be considered to determine whether another tax or built–up rate was in fact imposed in lieu of the particular tax sought to be imposed automatically under § 3(b).

### B. California's Bank Franchise Tax

 We now turn to the question whether the built–up rate of California's franchise tax on banks was in fact imposed in lieu of the sales tax on sales to national banks.

There can be no serious dispute on this point because it is apparent that during the bridge period sales tax on sales to banks was imposed *in addition* to the built–up rate of the franchise tax. Thus, the franchise tax could not have been intended by the California legislature to be in lieu of the sales tax. Moreover, the method used to compute the built–up rate of the franchise tax applied to banks could not have taken into account the sales tax on sales to banks. As already mentioned, this built–up rate was based on the ratio between personal property taxes paid by other corporations (but not by banks) and the net incomes of those corporations. *Security–First National Bank v. Franchise Tax Board*, 55 Cal.2d 407, 359 P.2d 625, 628, *cert. denied*, 368 U.S. 3, 82 S.Ct. 15, 7 L.Ed.2d 16 (1961). Because the sales tax on sales to banks was actually being collected during this period, there was no need to compensate for it in the built–up rate, and there was no place for this sales tax in the formula used to compute the rate.

Beginning with *Western Lithographic Co. v. State Board of Equalization*, 11 Cal.2d 156, 78 P.2d 731 (1938), and throughout the bridge period, the California courts consistently held the incidence of the state sales tax to be on the seller. *See Diamond National*, 425 U.S. at 268, 96 S.Ct. at 1530 (Stevens, J., dissenting). And even though *Diamond National* overruled this construction for federal purposes, the California courts continue to follow *Western Lithographic* for state law purposes. *See Xerox Corp. v. County of Orange*, 66 Cal.App.3d 746, 136 Cal.Rptr. 583, 589–90 (1977).[4]

Thus, there is no doubt that during the bridge period California's bank franchise tax was not actually imposed in lieu of the sales tax on sales to national banks. Hence, automatic imposition of the sales tax under § 3(b) cannot possibly result in unintended double taxation of national banks–the evil which Congress designed § 3 to avoid.

---

**4.** Crocker's argument that *Western Lithographic* was wrongly decided misses the point of our inquiry in this case. Whether or not we would agree with *Western Lithographic*, there is no question that it represented the law of California during the bridge period.

　Similarly misplaced is Crocker's suggestion that California should have changed the construction of its sales tax law after the Supreme Court's decisions in *First Agricultural National Bank* (holding the incidence of Massachusetts' sales tax to be on the buyer) in 1968, and *Dickinson* (same re Florida's sales tax) in 1969.

As Justice Stevens noted in his dissent in *Diamond National*, California's sales tax was different from the Massachusetts tax, and the California courts continued to hold, both in federal immunity cases and in cases involving purely state law, that the California sales tax was on the seller. 425 U.S. at 269–70, 96 S.Ct. at 1530–31. We are not concerned here with the propriety of California's construction of its sales tax law. We need ask only what the structure of the state tax law was during the bridge period.

### III. CONCLUSION

In conclusion, we hold that it was proper for the district court to consider state law in applying § 3(b) of Pub.L.No.91–156. We also hold that the built–up rate of the California franchise tax on national banks was not imposed in lieu of the sales tax on sales of tangible personal property to national banks. The judgment of the district court in favor of the Board is

AFFIRMED.