**UNITED STATES of America, Plaintiff,**

**v.**

**STATE OF MARYLAND and Public Service Commission of the State of Maryland, Defendants,**

**and**

**People's Counsel of the State of Maryland, Defendant-Intervenor.**

Civ. No. H–78–1063.

United States District Court,
D. Maryland.

June 12, 1979.

William L. Shraberg, Tax Div., Dept. of Justice, Washington, D.C., and Edward M. Norton, Jr., Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Gerald I. Langbaum, Asst. Atty. Gen., Baltimore, for defendant State of Md.

John B. Gontrum, Staff Atty., Baltimore, Md., for defendant Public Service Com'n of State of Md.

Philip S. Shapiro, Asst. People's Counsel, Baltimore, Md., for defendant People's Counsel of State of Md.

ALEXANDER HARVEY, II, District Judge:

This case presents the question whether agencies of the federal government which purchase electricity from utility companies within the State of Maryland must pay an exaction imposed by State law and termed an "environmental surcharge." Presently before the Court are defendants' motion for summary judgment and plaintiff's cross-motion for partial summary judgment. The parties have filed briefs in support of and in opposition to the pending motions, and this Court has heard oral argument. For the reasons hereinafter stated, defendants' motion for summary judgment will be granted, and plaintiff's motion for partial summary judgment will be denied.

The United States of America, plaintiff, has named as defendants in this civil action the State of Maryland and the Public Service Commission of the State of Maryland. The federal government is here challenging the constitutional validity of the Maryland environmental surcharge imposed by Article 78, § 54B, of the Annotated Code of Maryland (1975 Repl. Vol.), as applied to purchases of electricity by various agencies of the United States.[1] Besides declaratory and injunctive relief, the plaintiff is seeking to recover a money judgment from defendants for the amounts previously paid by the agencies in question because of the imposition of this surcharge.

By Orders dated October 11, 1978, this Court granted the motion to intervene filed by People's Counsel of the State of Maryland pursuant to Rule 24(b), F.R.Civ.P., but denied this intervenor's motion to dismiss the complaint. In their answers, the defendants deny that the exaction in question amounts to the imposition of an unconstitutional burden on the United States. For the purposes of this opinion, the term "defendants" will refer to both the original defendants and the intervening defendant.

**I**

The exaction being challenged by the federal government was first made a part of the law of Maryland by Chapter 31 of the Acts of 1971, effective July 1, 1971. As the title of the Act indicated, the legislative purpose was to establish an environmental trust fund from a surcharge on generated kilowatt hours of electric energy. The fund was to be used to underwrite a power plant environmental research and site evaluation program and to insure long-range and timely planning for power plant site selection and acquisition in order to strengthen the State's capability to define and manage a power plant environmental research program. Chapter 31, Acts of 1971.

In a preamble to Chapter 31, the Maryland Legislature recited its reasons for establishing this environmental trust fund, as follows:

\* \* \* The General Assembly of Maryland recognizes that electric power generation and distribution makes use of our environmental trust, including air, land and water and that the citizens of Maryland and other states benefit from the production of electric energy in Maryland and further recognizes that the electric companies \* \* \* as holders of public service franchises serving the public's interest, must bear, with other industries and governmental agencies at all levels, a shared responsibility with the citizen in the protection of the public environmental trust; and

\* \* \* For these several reasons, it is the intent of the Maryland General Assembly to involve the human, institutional and financial resources of the private sector and Local, State and Federal Government in a long-range, stably-funded, well-designed electric power plant environmental research program to protect the quality of the State's environment, including the Chesapeake Bay and its

1. The original complaint was brought by the United States on behalf of the Department of the Army. Amendments to the complaint have included the Department of the Navy, the Department of the Air Force, the National Aero-

nautics and Space Administration and the General Services Administration as additional federal agencies seeking relief from the payment of the exaction in question.

tributary waters, while also satisfying the electric energy needs of people and industry; and

\* \* \* It is the intent of the Maryland General Assembly to insure orderly governmental process without requiring the citizens of Maryland to pay excessive costs, either as taxpayers or as consumers.

To provide the necessary funds, an environmental surcharge was imposed by Chapter 31. Codified as § 54B(c) of Article 78 of the Annotated Code of Maryland (1969 Repl. Vol.), the original statutory provisions, insofar as they are pertinent to the pending dispute, were as follows:

(c) The Public Service Commission shall take cognizance of the mandate by the General Assembly to impose the surcharge per kilowatt hour of electric energy generated within Maryland by authorizing the electric companies to add the full amount of the surcharge to customers' bills. Revenues from the surcharge so required to be made by electric companies and collected by the Comptroller shall be placed into the special fund known as the Environmental Trust Fund. Commencing with 1972, the Secretary of Natural Resources will each year coordinate the preparation of a budget required to carry out the provisions of this act. Upon approval of the annual State budget, by the General Assembly of the State of Maryland, the Public Service Commission shall establish the amount of the surcharge per kilowatt hour for the fiscal year beginning July 1, 1972, and for each subsequent fiscal year thereafter, but in no event shall it continue beyond 1985 nor shall it ever exceed 0.3 mill per kilowatt hour. Prior to January 1, 1972, after consultation with the electric companies, the Comptroller shall establish the method of collection of the surcharge from the companies, provided that such collections shall accrue to the "Fund." In no event shall the utilities be required to pay into the fund a greater amount than that which has been collected less 1½ percent for expenses incurred in the collection thereof.

Similar provisions were enacted as Article 66C, § 763, Annotated Code of Maryland (1970 Repl. Vol.), which formerly read as follows:

763. Establishment of an Environmental Trust Fund

(a) The Environmental Trust Fund, hereafter known as the "Fund", is hereby created, effective January 1, 1972. For the purposes of this subtitle, there shall be established as an added cost of generation an environmental surcharge per kilowatt hour of electric energy generated in Maryland by any electric company as defined in Article 78 of the Annotated Code of Maryland. Such surcharge shall be initially assessed at 0.1 mill per kilowatt hour as of January 1, 1972.

The Public Service Commission shall take cognizance of the mandate by the General Assembly to impose the surcharge per kilowatt hour of electric energy generated within Maryland by authorizing the electric companies to add the full amount of the surcharge to customers' bills. Revenues from the surcharge so required to be made by electric companies and collected by the Comptroller shall be placed into the special fund known as the Environmental Trust Fund.

(b) Commencing with 1972, the Secretary of Natural Resources will each year coordinate the preparation of a budget required to carry out the provisions of this Act. Upon approval of the Annual State Budget, by the General Assembly of the State of Maryland, the Public Service Commission shall establish the amount of the surcharge per kilowatt hour for the fiscal year beginning July 1, 1972, and for each subsequent fiscal year thereafter, but in no event shall it continue beyond 1985 nor shall it ever exceed 0.3 mill per kilowatt hour.

Prior to January 1, 1972, after consultation with the electric companies, the Comptroller shall establish the method of collection of the surcharge from the companies, provided that such collections shall accrue to the "Fund". In no event

shall the utilities be required to pay into the fund a greater amount than that which has been collected less 1½% for expenses incurred in the collection thereof.

Chapter 4 of the Acts of Maryland, Special Session 1973, reenacted and recodified, with changes, the above provisions of Article 66C as § 3–302, Natural Resources Article, Annotated Code of Maryland (1973 Ed.), which formerly provided:

(a) The Environmental Trust Fund is created and continued. For the purpose of this subtitle, there is established as an added cost of generation, an environmental surcharge per kilowatt hour of electric energy generated in the State to be paid by any electric company as defined in the Public Service Commission Law. This surcharge initially shall be assessed at 0.1 mill per kilowatt hour as of January 1, 1972. The Public Service Commission shall impose the surcharge per kilowatt hour of electric energy generated within the State by authorizing the electric companies to add the full amount of the surcharge to customers' bills. Revenues from the surcharge made by electric companies shall be collected by the Comptroller and placed in the Fund.

(b) The Secretary annually shall coordinate the preparation of a budget required to carry out the provisions of this subtitle. Upon approval of the budget by the General Assembly, the Public Service Commission shall establish the amount of the surcharge per kilowatt hour for the fiscal year beginning July 1, 1972, and for each subsequent fiscal year. The surcharge may not continue beyond 1985 nor may it ever exceed 0.3 mill per kilowatt hour. The Comptroller shall maintain the method of collection of the surcharge from the companies and the collections shall accrue to the "Fund." The utilities are not required to pay into the Fund a greater amount than that which has been collected less 1½ percent for expenses incurred in the collection of the surcharge.

Subsequently, by Chapter 340 of the Acts of 1974, the Maryland Legislature amended both statutes, effective January 1, 1975. Section 54B(c) of Article 78 now reads, in pertinent part, as follows:

(c) The Public Service Commission shall impose an environmental surcharge per kilowatt hour of electric energy generated within Maryland and shall authorize the electric companies to add the full amount of the surcharge to customers' bills. To the extent that the surcharge is not collected from customers, the surcharge shall be deemed a cost of generation and shall be allowed and computed as such, together with other allowable expenses, for rate-making purposes. Revenues from the surcharge shall be collected by the Comptroller and placed into the special fund known as the Environmental Trust Fund. The Secretary of Natural Resources annually shall coordinate the preparation of a budget required to carry out the provisions of the power plant siting and research program, as set forth in the Natural Resources Article. Upon approval of the budget by the General Assembly, the Public Service Commission shall establish the amount of the surcharge per kilowatt hour for the fiscal year beginning July 1, 1972, and for each subsequent fiscal year. The surcharge may not continue beyond 1985 nor may it ever exceed 0.3 mill per kilowatt hour. The Comptroller shall maintain the method of collection of the surcharge from the companies and the collections shall accrue to the Fund. The Department shall credit against the amount required to be paid into the environmental trust fund by each electric company an amount equal to 1½ percent of the total surcharge attributed to each company on the basis of the electricity generated within Maryland.

As amended, § 3–302 of the Natural Resources Article now reads:

(a) There is an Environmental Trust Fund. For the purpose of this subtitle, there is established as an added cost of generation, an environmental surcharge per kilowatt hour of electric energy generated in the State to be paid by any

electric company as defined in the Public Service Commission Law. This surcharge initially shall be assessed at 0.1 mill per kilowatt hour as of January 1, 1972. The Public Service Commission shall impose the surcharge per kilowatt hour of electric energy generated within the State and shall authorize the electric companies to add the full amount of the surcharge to customers' bills. To the extent that the surcharge is not collected from customers, the surcharge shall be deemed a cost of generation and shall be allowed and computed as such, together with other allowable expenses, for rate-making purposes. Revenues from the surcharge shall be collected by the Comptroller and placed in the Fund.

(b) The Secretary annually shall coordinate the preparation of a budget required to carry out the provisions of this subtitle. Upon approval of the budget by the General Assembly, the Public Service Commission shall establish the amount of the surcharge per kilowatt hour for the fiscal year beginning July 1, 1972, and for each subsequent fiscal year. The surcharge may not continue beyond 1985 nor may it ever exceed 0.3 mill per kilowatt hours. The Comptroller shall maintain the method of collection of the surcharge from the companies and the collections shall accrue to the Fund. The Department shall credit against the amount required to be paid into the Environmental Trust Fund by each electric company an amount equal to 1½ percent of the total surcharge attributed to each company on the basis of the electricity generated within Maryland.

In order to carry out its statutory mandate, the Public Service Commission (hereinafter "the Commission") polls each electric utility within the State of Maryland to determine for the forthcoming year both the amount of electricity likely to be generated within the State and the amount of electricity likely to be sold within the State.

On the basis of this survey, the Commission establishes a surcharge rate and the amount each electric utility must remit to the Comptroller of the Treasury in order to meet the budgetary requirements of the Environmental Trust Fund. Funds are used for ecological and environmental research, for acquisition of possible sites for electric power plants, and for financing state and local administrative costs associated with power plant site acquisition and construction. In addition, after July 1, 1978, 10% of the Environmental Trust Fund was to be used to supplement funds necessary to carry out the duties of the People's Counsel of the Public Service Commission. Annotated Code of Maryland, Natural Resources Article, § 3–302(c).

Under the statutory scheme in effect both before and after 1975, the electric companies have been collecting the surcharge from their customers and remitting the funds to the Comptroller. Like other consumers of electricity, agencies of the federal government in Maryland have this environmental surcharge added to their bills. In moving for partial summary judgment, plaintiff asserts that both before and after January 1, 1975, the statutes in question amount to an unconstitutional state tax upon federal agencies within Maryland.[2] Defendants in turn have moved for summary judgment on the grounds (1) that the environmental surcharge is a utility rate or fee, and not a tax, and (2) that the legal incidence of the surcharge in any event falls upon the electric companies and not upon the United States. The parties agree that none of the material facts are disputed and that summary judgment for one side or the other is appropriate.

## II

■ Little time need be spent in considering defendants' contention that Maryland's environmental surcharge is not a tax. Defendants argue that the surcharge mere-

---

**2.** Plaintiff's motion does not ask for the entry of a money judgment in its favor at this time. Depending upon this Court's ruling, further discovery will be necessary to determine the amount due to the federal government as repayment of sums claimed to have been illegally collected by the State of Maryland in the past.

ly compensates the State for services rendered by the State which benefit the electric utilities. Defendants assert that the proceeds of the surcharge are not used to finance general governmental activities but are devoted solely to utility-related functions.

Such an argument misconstrues the true nature of a tax. The Supreme Court has defined a "tax" as an "enforced contribution to provide for the support of [the] government." *United States v. LaFranca*, 282 U.S. 568, 572, 51 S.Ct. 278, 280, 75 L.Ed. 551 (1931). Courts have generally defined taxes as "taking money from the taxpayer for public purposes." *Puglisi v. United States*, 564 F.2d 403, 408 (Ct.Cl.1977).

From a review of the statutory provisions in question in the light of the record here, there can be little doubt that this environmental surcharge is an involuntary exaction by the State of money from the electric utilities. The electric companies have no choice as to the payment or non-payment of these surcharges. Nor can it be doubted that these funds are used to finance projects which benefit the general public. The ecological, biological and environmental studies financed by the Environmental Trust Fund are clearly intended to benefit the general public and not merely the electric utilities. The fact that obvious benefits accrue to the general public conclusively establishes that Maryland's environmental surcharge is a tax and not a utility rate. *See National Cable Television Ass'n v. United States*, 415 U.S. 336, 340-41, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).

### III

■ The more difficult question presented in this case is whether this environmental surcharge, as applied to purchases of electricity by agencies of the United States, is unconstitutional. Since *M'Culloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819), it has been firmly established that possessions, institutions and activities of the federal government in the absence of express Congressional consent are not subject to any form of state taxation. *United States v. County of Allegheny*, 322 U.S. 174, 177, 64 S.Ct. 908, 88 L.Ed. 1209 (1944). However, the right of the federal government to be free of direct taxation by the State does not mean that it has immunity from paying added costs resulting from the taxation of a supplier of goods or services. As the Supreme Court said in *United States v. Boyd*, 378 U.S. 39, 44, 84 S.Ct. 1518, 1521, 12 L.Ed.2d 713 (1964):

> The Constitution immunizes the United States and its property from taxation by the States, but it does not forbid a tax whose legal incidence is upon a contractor doing business with the United States, even though the economic burden of the tax, by contract or otherwise, is ultimately borne by the United States. [Citations omitted.]

Determining the legal incidence of a tax, however, is not always a simple matter. Particularly applicable in this case is the admonition of the Supreme Court in *James v. Dravo Contracting Co.*, 302 U.S. 134, 150, 58 S.Ct. 208, 216, 82 L.Ed. 155 (1937), that the courts must observe "close distinctions in order to maintain the essential freedom of government in performing its functions, without unduly limiting the taxing power which is equally essential to both Nation and State under our dual system." Several years later the Supreme Court observed that "the line between the taxable and the immune has been drawn by an unsteady hand." *United States v. Allegheny County, supra*, 322 U.S. at 176, 64 S.Ct. at 910.[3]

■ Indeed, there are very few definitive rules which show precisely where the legal

---

**3.** Mr. Justice Stevens, dissenting in a recent opinion, observed that a determination as to "where the legal incidence of a State tax falls is not the most intriguing task that judges are called upon to perform." *Diamond National Corporation v. State Board of Equalization*, 425 U.S. 268, 271-272, 96 S.Ct. 1530, 47 L.Ed.2d 780 (1976). The formalistic, mechanical approach which a court is required to follow in applying the legal incidence test has been criticized by a recent commentator. *Federal Immunity from State Taxation: A Reassessment*, 45 Chi.L.Rev. 695 (1978).

incidence of a particular tax lies. In general, it is established that the legal incidence of a tax does not necessarily fall upon the person technically responsible for remitting the tax if the taxing statute requires another person to pay the tax. *First Agricultural National Bank v. Tax Commission*, 392 U.S. 339, 347, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968); *United States v. Minneapolis*, No. 4–77 Civ. 346, slip op. at 6 (D.Minn. Feb. 6, 1979). On the other hand, the mere fact that a tax imposes an economic burden on the federal government does not render that tax unconstitutional, since the economic burden of taxes imposed upon the sale of goods or services is traditionally passed on to the purchasers of those goods. *Gurley v. Rhoden*, 421 U.S. 200, 204, 95 S.Ct. 1605, 44 L.Ed.2d 110 (1975).

■ In determining where the legal incidence of a tax falls, a court must consider the taxing statute in the light of all relevant circumstances. *United States v. City of Detroit*, 355 U.S. 466, 469, 78 S.Ct. 474, 2 L.Ed.2d 424 (1957). The inquiry is a legalistic one, and the result often turns on the interpretation to be given a statute. Small differences in the language of the statutes or in the facts of two different cases can therefore result in decisions which might appear inconsistent in the absence of close analysis. This is best illustrated by comparing the result in *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941) with that in *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954). Both cases involved similar sales taxes on third-party contractors with the federal government. In *King & Boozer*, the Supreme Court held that the sales tax was constitutional as applied to purchases by the federal contractor because the sales were made directly to the contractor. In *Kern-Limerick, Inc.*, however, the Court ruled that the sales tax was unconstitutional because the sales in that case were made directly to the federal government for the use of the contractor.

In asserting that the legal incidence of the Maryland environmental surcharge does not fall upon the United States or any of its agencies, the defendants rely heavily upon *United States v. City of Leavenworth*, 443 F.Supp. 274 (D.Kan.1977).[4] That case involved a franchise fee imposed by a city ordinance upon all utility companies conducting business within the limits of the City of Leavenworth, Kansas. The amount of the fee was based upon the utility's gross revenues, but the ordinance did not require the utilities to directly pass the franchise fee through to their customers. The Kansas State Corporation Commission had decided, however, that the utilities must pass through these franchise fees to their customers on a *pro rata* basis. In a well-reasoned opinion, which reviewed all the applicable authorities, the Court upheld the constitutionality of the franchise fee as applied to the United States on the ground that its legal incidence did not fall upon the United States. The Court emphasized that there was "no requirement" in the ordinance that the utility company pass on to the United States or any other customer all or any part of the financial burden of the franchise fee. 443 F.Supp. at 282. Since legal liability for payment of the exaction fell upon the utility company, the Court held that the mere fact that the franchise fee burden was passed on to the United States was not determinative of the incidence of the tax. The franchise fee was sustained because the Ordinance in question was not an "effort to tax sales to the final consumer." 443 F.Supp. at 282.

■ From the applicable authorities, it is apparent that it is not controlling that an entity other than a federal agency is required to pay the tax in question to the taxing authority. In this case then, the fact that the electric companies pay the environmental surcharge does not in and of itself require the conclusion that this enactment is constitutional. On the other hand, it is also not determinative that the eco-

---

**4.** An appeal from that decision was taken by the government to the United States Court of Appeals for the Tenth Circuit but was later dismissed by stipulation of the parties. (8th Cir. No. 79–1241).

nomic burden of this tax may ultimately fall upon an agency of the United States. In a case such as this one, inquiry into the facts and the controlling statute is necessary. If this inquiry indicates that under the applicable facts and the controlling statutory provisions the electric companies are *required* to pass the tax on to their customers for payment, then the exaction is unconstitutional insofar as federal agencies are concerned. A state tax which "must" be passed on to the federal purchaser of goods or services is invalid. *First Agricultural National Bank v. State Tax Commission, supra,* 392 U.S. at 347, 88 S.Ct. 2173; *United States v. Mississippi Tax Commission,* 421 U.S. 599, 609, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975). On the other hand, if the inquiry discloses that there is no such mandatory requirement, then the incidence of the tax does not fall upon the federal government and the exaction is a valid one. If the statute which imposes a tax does not require that the tax be passed on to federal purchasers of goods or services, then the legal incidence of that tax does not fall upon those federal purchasers. *United States v. Mississippi Tax Commission, supra* at 610, n. 9, 95 S.Ct. 1872 (1975); *Polar Co. v. Andrews,* 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964).

When the facts here and the statutory provisions in question are considered in the light of these principles, this Court concludes that neither the 1974 Act nor the 1971 Act requires that Maryland's environmental surcharge be passed along to customers of the electric companies. Accordingly, this Court concludes that the exactions in question are valid and constitutional.

As amended by the 1974 Act, § 54B(c) of Article 78 now provides that the Public Service Commission "shall impose" an environmental surcharge and "shall authorize the electric companies to add the full amount of the surcharge to customers' bills." Quite clearly, the tax is directly imposed on the electric companies. Indeed, the title of the statute itself makes it clear that the environmental surcharge is "a direct obligation of the electric companies."

Not only is the word "authorize" used, but also the very next sentence of the statute provides that to the extent "that the surcharge is not collected from customers, the surcharge shall be deemed a cost of generation and shall be allowed and computed as such, together with other allowable expenses for rate-making purposes." Similar language is contained in both § 54B(c) of Article 78 and in § 3–302(a) and (b) of the Natural Resources Article. In other words, the electric companies have the option of collecting the surcharge from their customers or not. If they choose not to pass the exaction on to their customers, then the surcharge becomes a cost of generation and is allowed and computed as such for rate-making purposes. The tax would then be recovered by an increase in the rate basis and resulting higher rates charged.

The term "authorize" is generally given a permissive connotation rather than a mandatory one, and has been held to denote ordinarily a power to act as opposed to an obligation to act. *Shopen v. Bone,* 328 F.2d 655 (8th Cir. 1964); *see also Ballentine's Law Dictionary* (3d Ed.1969), p. 112. Particularly when the word "authorize" is considered with other language in § 54B(c), this Court concludes that the Legislature intended to give the word a permissive meaning. Indeed, the Public Service Commission has never interpreted this statute to mean that the electric companies are required to pass the exaction on to their customers. A court should accord great weight to the construction of a statute by an executive agency charged with its enforcement. *Public Service Commission v. Howard Research & Development Corp.,* 271 Md. 141, 152, 314 A.2d 682 (1974).

Under the enactment in question, the electric companies are required to pay the assessed environmental surcharge but they are not required to pass the surcharge on to their customers, including federal agencies which purchase electricity from them. Thus, the legal incidence of the tax does not fall upon the federal government. *United States v. City of Leavenworth, su-*

*pra.* So long as the state tax in question is not directly laid on the federal government, it is valid if nondiscriminatory.[5] *James v. Dravo Contracting Company, supra,* 302 U.S. at 160, 58 S.Ct. 208.

 Although the meaning and intent of the 1971 Act is not nearly as clear as that of the 1974 Act, this Court is satisfied that the earlier enactment like the later one also did not require electric companies to pass this exaction on to their customers. In construing the awkwardly drafted statutory provisions, this Court has been guided by the principle recognized by the Supreme Court in *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 483, 59 S.Ct. 595, 600, 83 L.Ed. 927 (1939), that "the implied immunity of one government and its agencies from taxation by the other should as a principle of statutory construction be narrowly restricted." In the earlier versions of both § 54B(c) and of § 3–302, like the later versions, the Public Service Commission is also directed to impose the surcharge "by authorizing" the electric companies to add the amount of the surcharge to customers' bills. Passing the exaction on to customers is therefore permissive rather than mandatory. Having intended that the word "authorize" should have a permissive connotation in the 1974 Act, the Legislature could hardly have intended a completely contradictory meaning three years before. The same word "authorize" (or a derivative thereof) was used in the same legislation, and had the Legislature wished to make it mandatory that the exaction be passed on, the word "require" or the words "by requiring" would have been used in either or both statutes.

Nevertheless, there is other language in the earlier versions of both § 54B(c) and § 3–302(a) which raises a question concerning the true intent of the Legislature when it enacted Chapter 31 of the Acts of 1971. The second sentence of both § 54B(c) of

Article 78 and of § 3–302(a) of the National Resources Article (originally to have been codified as § 763 of Article 66C)[6] formerly provided that revenues "from the surcharge so required to be made by electric companies and collected by the Comptroller shall be placed into the special fund known as the Environmental Trust Fund."

After considering the entire legislative history of these enactments, commencing with the enactment of Chapter 31 of the Acts of 1971 and concluding with the enactment of Chapter 340 of the Acts of 1974, this Court concludes that the Legislature never intended that this exaction would be a mandatory tax on customers of the electric companies. The words "revenues so required" in the 1971 versions of the statutes can reasonably be construed to mean revenues which are mandatorily imposed by the statute on the electric companies but which the latter are permissively authorized to collect. Because the words "so required" might conceivably be misconstrued, they were dropped when, in the 1973 Special Session of the Legislature, § 766(a) of Art. 66C was recodified as § 3–302(a) of the Natural Resources Article. See Chapter 4, Acts of Maryland, Special Session 1973. As a result of that enactment, § 3–302(a), after January 1, 1974, provided that revenues "from the surcharge made by electric companies shall be collected by the Comptroller and placed in the Fund." The confusing words "so required" were thus removed from the statute so that there would be no doubt that the Legislature had intended the words "by authorizing" to have a permissive meaning.

The following year, when the Legislature enacted Chapter 340 of the Acts of 1974, it took further steps to eliminate any confusion which might have resulted from the language of the earlier statutes. That enactment which became effective January 1,

---

**5.** No claim has been made in this case that the tax discriminates against the federal government, the plaintiff having conceded that the exaction here is nondiscriminatory.

**6.** Pursuant to Chapter 31 of the Acts of 1971, the statutory provisions which are now § 3–

302(a) were originally to have been codified as § 763 of Article 66C. However, the provisions were in fact codified as § 766(a) of Article 66C. *See* "Revisor's Note," Chapter 4, Acts of Maryland, Special Session 1973, p. 540.

1975, made it clear that the Legislature had intended from the outset that the words "by authorizing" in § 54B(c), in § 766(a) and in § 3–302 were to have a permissive connotation. The words "so required" were then removed from § 54B(c) and other language was added to both § 54B(c) and to § 3–302 to make it clear that the electric companies had no mandatory duty to pass the exaction on to their customers. Thus, the 1974 Act also served to confirm the construction intended by the Legislature but not clearly expressed in the 1971 Act.

There is an alternative construction of the law as it existed before January 1, 1975 which also supports this Court's conclusion that the legal incidence of this tax does not fall on the federal agencies in question. Both § 54B(c) and § 766(b), and subsequently § 3–302(a), provided before January 1, 1975 that the electric companies were not required to pay into the Environmental Trust Fund a greater amount than collected from their customers. Clearly then, there was no mandatory requirement in the law that customers of the electric companies were legally liable for payment of the exaction. In *Gurley v. Rhoden, supra*, the Supreme Court, in upholding a state tax, noted that the statute had no provision making the vendee liable for payment of tax and found it persuasive that if the vendor did not pay the tax, it could not be collected from the vendee. 421 U.S. at 205–206, 95 S.Ct. 1605. In its pre-1975 form, the Maryland law clearly excused the electric companies (the vendors) from liability for payment of the tax if they did not collect it from their customers (the vendees). Under such circumstances, it is quite apparent that the law did not require that the tax be paid by the federal agencies and the other customers of the electric companies, and therefore the legal incidence of the tax did not fall on these vendees.

Plaintiff, asserting that the *Leavenworth* case was wrongly decided and should not be followed here, contends that Maryland's environmental surcharge is in fact a tax imposed upon the final consumer. In support of its position, plaintiff relies upon another recent decision, *United States v. Minneapolis, supra.*[7] In that case, the Court held that a franchise fee imposed upon the Minnesota Gas Company by the City of Minneapolis was unconstitutional as applied to purchases of natural gas by an agency of the United States. The Court ruled that the legal incidence of the franchise fee was upon the United States because the city required the utility to add the franchise tax to its rates. *Supra* at p. 7.

A comparison of the *Minneapolis* and *Leavenworth* cases supports this Court's conclusion in this case. Both District Courts looked to the statute which imposed the tax to determine whether the statutory provisions in question required the tax to be passed on to the final consumer. In *Leavenworth*, although the State Corporation Commission had required the tax to be passed on, the taxing authority had not, and the Court ruled that the legal incidence of the tax therefore fell upon the utility. In the *Minneapolis* case, the taxing authority required the tax to be passed through to the consumer, thereby placing the legal incidence of the tax upon the United States as a customer.

Indeed, the facts of this case more strongly support upholding the constitutionality of the tax than in the *Leavenworth* case. There, the Kansas State Corporation Commission had required customers of the utility to pay the franchise fee, but the Court still found the exaction to be valid. Here, the Public Service Commission has done no more than merely authorize the electric companies to pass the tax on to their customers. In both cases, the statutory provisions in question, construed in the light of all the circumstances, must control in determining where the incidence of the tax falls.

This Court is satisfied that under both the 1971 and the 1974 enactments, Maryland's environmental surcharge is imposed upon the electric companies and not upon their customers. Both enactments are

---

7. An appeal is pending in that case. (8th Cir. No. 79–1241).

therefore constitutional as applied to purchases of electricity by agencies of the United States in Maryland.

## IV

For these reasons, plaintiff's motion for partial summary judgment will be denied, and defendants' motion for summary judgment will be granted. An appropriate Order will be entered by the Court.

