## COMPTROLLER OF THE TREASURY *v.* MARYLAND NATIONAL BANK

[No. 308, September Term, 1979.]

*Decided December 7, 1979.*

The cause was argued before MOORE, LISS and COUCH, JJ.

*Paul S. Sugar, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*Geoffrey S. Mitchell,* with whom were *Christopher R. West* and *Semmes, Bowen & Semmes* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

This dispute is another chapter in the conflict between State and federal power that began in the early years of the Republic. It originated when the appellant, Comptroller of the Treasury (Comptroller), levied a retail sales tax on rental payments under electronic equipment leases entered into by the appellee, Maryland National Bank (taxpayer), prior to September 1, 1969. Specifically, the parties' dispute turns upon the construction of the words "contract of purchase" found in a "temporary" federal statute dealing with the immunity from State taxation previously enjoyed by national banks. Act of December 24, 1969, Pub. L. No. 91-156, 83 Stat. 434 (current version at 12 U.S.C. § 548 (1976)).[1] The statutory language which has generated the instant litigation is § 5(c), found in § 1 of the Act:

> "No *sales tax* or *use tax* complementary thereto shall be imposed pursuant to this paragraph 5 upon *purchases, sales,* and *use* within the taxing jurisdiction of tangible personal property which is the subject matter of a *written contract of purchase* entered into by a national bank prior to September 1, 1969." (Emphasis added.)

[hereinafter referred to as § 5(c)].

It is the Comptroller's position that federal law must control the interpretation to be given this provision, and that by applying settled principles of statutory construction,

---

1. Before the 1969 Act was passed, a State was allowed to levy only four types of tax on the operations of national banks within its borders. 12 U.S.C. § 548(1)-(4) (1964). Section 1 of the 1969 Act added § 5(a) to the Code and, in relevant part, permitted a State to "impose any tax which is imposed generally on a nondiscriminatory basis ... on a national bank having its principal office within such State in the same manner and to the same extent as such tax is imposed on a bank organized and existing under the laws of such State." Section 5(c), set out in the text, was an exception to the broad language of § 5(a) for sales and use taxes and was constructed in the nature of a grandfather provision. Subsections 1-4 and the "temporary" § 5 were superseded by the current statutory language found in 12 U.S.C. § 548 (1976).

payments for the rental of tangible personal property by national banks are taxable by the State because they do not involve "written contracts of purchase." The taxpayer argues that State law must guide the application of the statute, that under Maryland law "contract of purchase" includes a lease, and thus, the taxation of the rental payments involved herein is barred by § 5(c).[2] Md. Code Ann., art. 81, § 324(d) (1975). *See also* COMAR 03.06.01.73.

## I. *The Facts*

The facts are undisputed and are summarized in a Stipulation of Facts received into evidence by the Maryland Tax Court. Between June 1, 1961 and September 1, 1969, the taxpayer entered into written lease agreements with Burroughs Corporation and the National Cash Register Company for computers, data and document processors, and bookkeeping systems. The Comptroller, believing that the Act of December 24, 1969, to which we have adverted, permitted the State to begin taxing those rental payments falling due after the date of the Act, assessed the taxpayer for the 4% retail sales tax. Md. Code Ann., art. 81, § 324 *et seq.* (1975). The Retail Sales Tax Division claimed a total tax due of $119,193.80.

The taxpayer filed an application for a revision of the assessment with the Comptroller's office; this application was denied on July 3, 1972. Subsequently, the taxpayer requested and was given a formal hearing before a Hearing Officer appointed by the Comptroller. On November 18, 1974, the Hearing Officer held the lease transaction to be taxable. Following that decision, the taxpayer took an appeal to the Maryland Tax Court which found in its favor holding that the

---

2. It also appears to be the taxpayer's position that the lease transactions here involved are immune from taxation under § 5(c) even applying federal law. Nowhere in its brief does the taxpayer state that an application of federal law would lead to the same result, but it does argue that "Congress' sole intent in including this grandfather clause was to insure that States could not impose retroactive sales taxes on *any* transactions which were entered into by national banks prior to September 1, 1969." (Emphasis added.)

"leases are exempt from taxation . . ." pursuant to § 5(c). The Comptroller appealed to the Baltimore City Court. The Honorable Martin J. Greenfeld affirmed the decision of the Maryland Tax Court, and the Comptroller has appealed that adverse ruling to this Court. We, too, shall affirm.

## II. National Banks' Immunity from State Taxation

On April 10, 1816, Congress created the Bank of the United States, the first national bank. Act of April 10, 1816, 3 Stat. 266. One year later, the General Assembly of Maryland passed an Act which imposed a tax on the Maryland operations of the Bank of the United States. 1817 Md. Laws, ch. 156. In 1819, the Supreme Court, speaking through Chief Justice Marshall, upheld the constitutionality of the Act creating the Bank of the United States, and ruled also that the States could not impose taxes upon "the operation of an instrument employed by the government of the Union. . . ." M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 436 (1819). Thus was created the doctrine of immunity from State taxation of federal instrumentalities.

During the Civil War, the need to stabilize currency and provide national uniformity in banking led Congress to pass the 1863 Currency Act. Act of February 25, 1863, ch. 58, 12 Stat. 665. The Act did not permit any State taxation of national banks. The following year, however, Congress delineated four permitted methods of taxation of national banks by the States. Act of June 3, 1864, ch. 106, § 41, 13 Stat. 111. That Act, together with subsequent amendments in 1868,[3] 1923,[4] and 1926,[5] marked "the outer limit within which States can tax national banks." First Agricultural National Bank of Berkshire County v. State Tax Commission, 392 U.S. 339, 345 (1968). As codified in 12 U.S.C. § 548 (1964), the statute was construed in First Agricultural Bank to exclude the imposition of sales and use taxes on national banks. Congress, responding to the outcry by State taxing

3. Act of February 10, 1868, ch. 7, 15 Stat. 34.
4. Act of March 4, 1923, ch. 267, 42 Stat. 1499.
5. Act of March 25, 1926, ch. 88, 44 Stat. 223.

authorities following *First Agricultural Bank,*[6] passed the Act of December 24, 1969, *supra,* Pub. L. No. 91-156, 83 Stat. 434, which had two important components. First, a "temporary amendment" to § 548 allowed certain additional State taxes to be imposed on national banks during an interim period ending on January 1, 1972 (later extended to January 1, 1973 by Act of December 22, 1971, Pub. L. No. 92-213, 85 Stat. 775); Section 5(c), quoted above, is part of that amendment. Second, after the interim period, § 548 was superseded by a permanent § 548 which provided that "a national bank shall be treated as a bank organized and existing under the laws of the State...." 12 U.S.C. § 548 (1976). This provision effected a total elimination of the immunity from State taxation which national banks had previously enjoyed. We are here concerned only with the interpretation of § 5(c) of the superseded § 548 pertaining to sales or use taxes.

### III. *The Applicable Law: State or Federal*

Both lower courts held that State law controlled the interpretation to be given the phrase "written contract of purchase." In his brief, the Comptroller argues that:

> "The Supreme Court has stated plainly that federal law [,] not state law [,] should be used to interpret whether, within the meaning of Public Law No. 91-156, a state tax law is applicable. Thus, the word "purchase" as used in Section 5(c) should be analyzed according to federal law and the meaning of Public Law No. 91-156." [7]

---

6. The various letters, resolutions, and petitions which were sent to Congress are reproduced in the pertinent legislative history. *See* n. 10, *infra.*

7. In support of this proposition, the Comptroller cites the recent case of Chase Manhattan Bank v. Finance Administration of the City of New York, 440 U.S. 447, 99 S.Ct. 1201 (1979), a *per curiam* opinion in which the Court applied federal law in deciding whether or not a State tax is a tax on tangible personal property. In cases involving immunity of national banks from State taxation federal law has been applied in a series of Supreme Court cases. Society for Savings in the City of Cleveland v. Bowers, 349 U.S. 143, 151 (1955); First Agricultural Bank of Berkshire County v. State Tax Commission, 392 U.S. 339, 347 (1968); Diamond National Corp. v. State Board

We find it unnecessary to address this issue. In our view, the application of either State or federal law to § 5(c) results in immunity from State taxation for the lease transactions involved herein.

## A. State Law

If State law does control the scope of the interpretation to be given to the words "contract of purchase," then the leases involved herein are clearly immune from the Maryland tax for the period here in dispute.[8] Even the Comptroller does not dispute this finding of the Baltimore City Court and the Maryland Tax Court in his appeal.

The Maryland Retail Sales Tax Act in effect at the time defined "sale" to include the "rental, lease, or license to use ... by a vendor to a purchaser." Md. Code Ann., art. 81, § 324(d) (1975). In addition, the Maryland Use Tax in effect at the time defined "purchase" to include a "lease, rental or grant of a license to use ..., store or consume the tangible personal property." Md. Code Ann., art. 81, § 372(f)(2) (1975). See also COMAR 03.06.01.73(A).

There can be no doubt that a "contract of purchase" under the applicable Maryland statutes includes the taxpayer's lease of tangible personal property. Applying Maryland's definition of "contract of purchase," to § 5(c) results in immunity for the taxpayer from the Maryland Sales and Use Taxes for the lease payments made prior to January 1, 1973, the date on which the immunity was finally and fully abrogated. 12 U.S.C. § 548 (1976).

---

of Equalization, 425 U.S. 268 (1976) (per curiam). See also United States v. State Board of Equalization, 450 F.Supp. 1030, 1035 (N.D. Cal. 1978).

The instant case is unlike those cited because here the Comptroller is seeking to apply federal law in order to avoid the immunity, while the taxpayer is seeking to apply State law in order to preserve the immunity. In the cases cited, the State sought to avoid the immunity by applying State law. The Supreme Court has refused to allow State law to defeat an immunity granted by Congress and it is doubtful that the Court would permit the immunity to be denied where, as here, State law supports it.

8. The leases were the subject of written agreements entered into prior to September 1, 1969, as required by § 5(c).

## B. *Federal Law*

In construing § 5(c) as a matter of federal law, the Comptroller essentially urges that we isolate the words "contract of purchase" from the remainder of the statute and interpret them under a strict definition to include only a transaction "where title and possession is transferred, *i.e.,* a traditional sale, and not . . . a lease where only possession is transferred." This argument ignores a basic rule of statutory construction that the statute is to be read as a whole:

> "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."

*United States v. Heirs of Boisdoré,* 49 U.S. (8 How.) 113, 122 (1849), *quoted in Philbrook v. Glodgett,* 421 U.S. 707, 713 (1975). Of course, the paramount concern in construing a statute is to give effect to the intent of the legislature. *Id.* It is also true that superficial "plain meaning" does not preclude a resort to other useful and viable tools of statutory construction. *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 10 (1976).

We begin with the naked language of § 5(c):

> "No *sales tax* or *use tax* complementary thereto shall be imposed pursuant to this paragraph 5 upon *purchases, sales,* and *use* within the taxing jurisdiction of tangible personal property which is the subject matter of a *written contract of purchase* entered into by a national bank prior to September 1, 1969." (Emphasis added.)

The statute purports to bar any "sales tax or use tax complementary thereto . . . upon purchases, sales, and *use.* . . ." But, there is also the additional requirement that the transaction exempted from sales or use taxation be a product of a "written contract of purchase entered into . . . prior to September 1, 1969." Some confusion results from this language. In the same section the statute applies only to "purchases, sales, and use" that are the subject of a "contract

of purchase." Either the latter term was intended to restrict the scope of § 5(c) as the Comptroller urges,[9] or the term is merely descriptive of those written contracts subject to State sales and use taxes, as the taxpayer urges. In construing § 5(c) and particularly the meaning to be given to the words "contract of purchase," we recall the admonition given by Chief Justice Marshall in *M'Culloch*:

> "Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense — in that sense which common usage justifies."

*M'Culloch*, 17 U.S. (4 Wheat.) at 414. The statute under consideration lacks "plain meaning." In order properly to interpret the language of § 5(c) and the underlying congressional intent, it is necessary for us to turn to the other available tools of statutory construction and to consider the purposes and policy of the 1969 Act as evidenced in the relevant legislative materials.

As we have earlier indicated, the pertinent legislative history discloses that § 5(c) and the Act of which it forms a part were passed in the aftermath of the Supreme Court's decision in *First Agricultural Bank, supra*, 392 U.S. 339.[10] In

---

9. Judge Greenfeld of the Baltimore City Court felt that the Comptroller's interpretation of "contract of purchase" was too restrictive:

"If read as narrowly as the Comptroller urges, then a contract of 'sale' would *not* be exempt under [§ 5(c)], while a contract of 'purchase' would be exempt. Under such reasoning, the inadvertent (and probably meaningless) designation of a transaction by the parties as a 'contract of sale' instead of a 'contract of purchase' would trigger a tax and disqualify the exemption."

Calling this distinction "overly technical," the Comptroller states that "construing 'purchase' to include 'sale' does not alter the ordinary meaning of 'purchase. . . .' " The Comptroller, in seeking to distinguish between purchases and rentals, fails to explain why a distinction must not be made between purchases and sales when the statute itself refers to "purchases, sales, and use."

10. *See State Taxation of National Banks: Hearings on S.2065, S.2906, and H.R. 7491 Before the Sen. Comm. on Banking and Currency*, 91st Cong., 1st Sess. (1969); *H.R. Rep. No. 91-290*, 91st Cong., 1st Sess. (1969); *S. Rep. No.*

374

our review of the legislative history, we have noted that the witnesses' testimony, the comments of the various legislators, and the reports accompanying the Act indicate that the primary objective was to equalize the tax treatment of national and state banks. Congress realized, of course, that it could not immediately repeal the immunity of national banks from State taxation which existed in 1969. Some States had referenced their tax laws to the then existing statute, 12 U.S.C. § 548 (1964), and an immediate repeal of immunity could create havoc in those States. *See, e.g.,* Mo. Rev. Stat. § 148.030 (1969). In addition, other States taxed banking organizations separately from other corporate entities, and a repeal of immunity might well have resulted in "double taxation" for banks in such States. *See, e.g., State Taxation of National Banks: Hearings on S. 2065, S. 2906, and H.R. 7491 Before the Sen. Comm. on Banking and Currency,* 91st Cong., 1st Sess. 54 (1969) (statement of Mr. Frank Wille). To avoid this result, and also to enable the national banks to adjust to the new order, the Congressional conferees agreed on a temporary provision which permitted additional State taxation of national banks, but delayed the complete elimination of immunity until January 1, 1972 (later extended to January 1, 1973 by Act of December 22, 1971, *supra,* Pub. L. No. 92-213, 85 Stat. 775). *See Conf. Rep. No. 91-728 on* H.R. 7491, 91st Cong., 1st Sess., *reprinted in* [1969] U. S. Code Cong. & Ad. News 1601.

The language here in dispute received scant comment during the legislative process. Indeed, the focus of the hearings was on taxation of intangible personal property and the taxation by one State of a national bank with its principal office in another State. In the Report of the Senate Committee on Banking and Currency there is this sole reference to § 5(c):

> "The proposed new paragraph 5(c) prohibits the imposition, under paragraph 5, of sales and use taxes on tangible personal property which is the subject matter of written purchase contracts entered into prior to September 1, 1969."

*91-530,* 91st Cong., 1st Sess., *reprinted in* [1969] U.S. Code Cong. & Ad. News 1594; *Conf. Rep. No. 91-728 on H.R. 7491,* 91st Cong., 1st Sess., *reprinted in* [1969] U.S. Code Cong. & Ad. News 1601.

S. Rep. No. 91-530, 91st Cong., 1st Sess. 5, *reprinted in* [1969] U. S. Code Cong. & Ad. News 1594, 1597. Other than to provide a restatement of the statutory language, the report does little to indicate the congressional intent in enacting § 5(c). On the other hand, we find nothing to suggest that Congress intended § 5(c) to differentiate between sales and rentals in the application of immunity from State sales and use taxes.[11]

In our view, § 5(c) was a "grandfather" provision designed to avoid unexpected sales and use taxes on a national bank on all purchases, sales, and use of tangible personal property by a bank where a written contract covering such transaction was entered into prior to September 1, 1969. This interpretation is in accord with the expressed intent of Congress to equalize the tax burdens of state and national banks in each State as of January 1, 1973.[12] It is also in accord with a decision in an identical case where a State questioned the extension of immunity from sales or use taxation to a written lease contract. *Lake County National Bank of Painesville v. Kosydar,* 36 Ohio St.2d 189, 305 N.E.2d 799 (1973). There the Supreme Court of Ohio stated:

> "[T]here is no reason to believe that Congress meant the extension to apply only to one type of transaction subject to state sales and use taxes but not to another type of transaction equally subject to such taxes. In either case, the national banks — absent an extension of immunity — would be confronted with the imposition of unexpected taxes."

*Id.* at 193, 305 N.E.2d at 802.

---

11. It is significant, as the taxpayer correctly points out in its brief, "that on no occasion [in the available legislative materials] was any mention made of a purported distinction between contracts of sale and contracts of lease." *See* n.6, *supra.*

12. The Comptroller argues for a uniform national standard in interpreting "contract of purchase" to exclude a lease because reliance on State law would result in differing treatment of national banks in the several States. This argument assumes that the uniform federal interpretation sought by the Comptroller would have a concomitant effect on State taxation of national banks, when, in fact, the taxation of national banks would still be dictated by the individual statutes of each State. Interstate uniformity could be achieved only by abolishing State taxation; the Act was designed to assure only intrastate uniformity between state and national banks.

Under § 5(c), as construed under federal or state law, the Comptroller erroneously assessed the taxpayer for the sales and use taxes which are the subject of this appeal. We agree with the ultimate conclusions reached by both courts below, and therefore shall affirm the judgment of the Baltimore City Court.

*Judgment affirmed; costs to be paid by appellant.*

