**UNITED STATES of America, Appellant,**

v.

**STATE OF DELAWARE; Robert W. Chastant, Director of the Division of Revenue, State of Delaware.**

**No. 91–3153.**

United States Court of Appeals, Third Circuit.

Argued Sept. 3, 1991.

Decided March 12, 1992.

Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, David English Carmack (argued), William A. Whitledge, Attorneys, Tax Div., U.S. Dept. of Justice, Washington, D.C., for appellant.

Jos. Patrick Hurley, Jr. (argued), Deputy Atty. Gen., State of Del., Div. of Revenue, Wilmington, Del., for appellees.

Before BECKER and SCIRICA, Circuit Judges, and VanARTSDALEN, District Judge.*

---

* The Honorable Donald W. VanArtsdalen, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

BECKER, Circuit Judge.

The Dover Air Force Base, a United States military installation in Delaware, purchases electricity from a regulated public utility. Under the Delaware law taxing the distribution of electricity, the distributor, not the consumer, nominally pays the tax, but the Delaware Public Service Commission, which regulates utility rates in Delaware, is directed to adjust electricity rates such that the tax is passed through to consumers and the utility company's earnings are unaffected. As a result, consumers, including the United States, indirectly pay the Delaware utility tax.

Under the longstanding doctrine of intergovernmental tax immunity, direct state taxes on federal entities are per se unconstitutional absent congressional consent, but indirect taxes are constitutional where the tax does not discriminate against the federal government or significantly hamper federal operations. The question before us is thus whether to characterize the Delaware utility tax as a direct tax on the federal government, in which case it is unconstitutional as applied, or as an indirect tax, in which case it is constitutional.

In doctrinal terms, we must decide the legal incidence of the tax, which is distinct from both the economic incidence of the tax and the nominal liability to pay the tax. Although, as we shall explain, the analytic basis for distinguishing unconstitutional taxes from constitutional ones is problematic, the Supreme Court has squarely held that the legal incidence of a state sales tax falls on the federal government, even though nominally imposed on a supplier to the federal government, if the tax is mandatorily passed through to the United States. Because we conclude that the Delaware tax is, by statute, mandatorily passed through to consumers, we hold that the Delaware utility tax is unconstitutional as applied to sales to the Dover Air Force Base. We will therefore reverse the summary judgment of the district court in favor of the Delaware defendants and remand for it to calculate the amount of the refund to which the United States is entitled and then to enter judgment for the United States in the appropriate amount.

## I. THE FACTUAL AND PROCEDURAL BACKGROUND

Dover Air Force Base, a federal military installation, purchases electricity from both the City of Dover and the Delmarva Power and Light Company ("Delmarva"). The electricity for the military base comes from the City of Dover, while the electricity for the base's Family Housing Annex area comes from Delmarva. Only the sales of electricity from Delmarva are at issue in this case.[1]

Pursuant to 30 Del.Code Ann. § 5502(b) (Michie Supp 1990), Delmarva pays taxes to the State of Delaware based on the revenues that it receives for the electricity that it provides to customers. During the period relevant to this suit, subsection 5502(b) imposed a tax "upon any distributor of ... electricity ... at the rate of ... [4.25 or 5 percent] of the gross receipts or tariff charges received by the distributor for" electricity distributed within Delaware.[2] The Delaware Code provides that "[t]he tax imposed by § 5502(b) ... shall be imposed upon the distributor and is not to be construed as a tax upon the consumer or user." 30 Del.Code Ann. § 5503(b) (Michie 1985).

Consistent with 30 Del.Code Ann. § 5502(c), however, the Delaware Public Service Commission has adjusted Delmarva's rate schedule so that the tax of sub-

---

1. A separate lawsuit over the constitutionality of Delaware's application of its utility tax to electricity sales from the City of Dover to the Dover Air Force Base is pending in the District Court for the District of Delaware. That case may involve different issues because the Public Service Commission does not regulate the rates of the City of Dover, and hence the pass-through provision that is central to this case does not apply there. Accordingly, our discussion should not be taken as a comment on the merits of that action.

2. The Delaware legislature reduced the tax from 5 percent to 4.25 percent effective January 1, 1987. See notes accompanying 30 Del.Code Ann. § 5502 (Michie Supp 1990).

section 5502(b) is "passed through pro rata" to Delmarva's nonresidential customers, including the Dover Air Force Base,[3] and Delmarva's earnings are unaffected.[4] Also pursuant to subsection 5502(c), as amended effective 1985, the tax appears as a separate item on Delmarva's bills to the base.[5] As a result, since 1982, Dover Air Force Base has paid well over $100,000 to Delmarva so that Delmarva can pay Delaware the tax that Delmarva formally owes. In short, Delmarva technically pays the tax on electricity sales to the base, 30 Del.Code Ann. § 5504(a) (Michie 1985), but in fact the tax is passed through to and hence paid by the United States. Indeed, if the United States or any other customer did not pay Delmarva the amount of the tax billed, 30 Del.Code Ann. § 5504(b) (Michie 1985) would allow Delmarva a tax credit for that full amount.

On August 4, 1988, the United States brought this suit in the district court seeking: (1) a determination that the tax was unconstitutional as applied to electricity sales to it; (2) a refund of taxes paid (plus interest);[6] and (3) an injunction against future imposition of the tax. The parties both moved for summary judgment. According to the United States, the legal incidence of the tax is on the federal government, and, under venerable constitutional principles of intergovernmental tax immunity implied from the Supremacy Clause, U.S. Const. art. VI, cl. 2, the states may never directly tax the federal government without congressional consent, which is not present here. The Delaware defendants countered that the legal incidence of the tax was on Delmarva, hence the tax was constitutional. The district court granted the Delaware defendants' motion and denied the United States' motion. See *Unit-*

3. Under 30 Del.Code Ann. § 5506(e) (Michie 1985), revenues from electricity supplied to residential users of electricity are exempt from the tax, and correspondingly no tax is passed on to residential users. Whether the exemption of subsection 5506(e) applies to electricity supplied to the Family Housing Annex at Dover Air Force Base is unclear: the electricity is purchased for residential use but at commercial voltage and therefore at the commercial tariff rate. The Delaware courts have not resolved whether subsection 5506(e) applies to residential uses of commercial voltages, and that issue is not before us.

4. Subsection 5502(c) reads, in full:

(c) When the tax imposed by subsection (b) of this section applies to a distributor subject to the regulation of the Public Service Commission, the Commission is directed, after consultation with such distributor and without a public hearing, to adjust the tariff of such distributor so that the tax is passed through pro rata to the distributor's customers and the distributor's earnings are neither increased nor decreased by such tax. The tariff adjustments filed by such distributor and approved by the Public Service Commission shall not incorporate the tax in the charges for commodities and services, and the tax shall appear on the customer's bill as a separate item. The Public Service Commission is further directed to allow such adjusted tariffs and the rates therein to become effective immediately upon filing without any requirement of 30 days' notice and without suspension thereof. The Public Service Commission may enter any orders which shall be necessary to permit the tax to be passed through to such distributor's customer while revised tariffs and billing procedures are being prepared. 30 Del.Code Ann. § 5502(c) (Michie Supp 1990).

5. *Delaware taxes telephone services differently from other utility services, and the state argues that the contrast is instructive.* Subsection 5502(a) imposes a tax on telephone services, but subsection 5503(a) provides that the telephone tax "shall be collected by the distributor from the ultimate consumer as a separate item not included in the sales price or tariff charge." In other words, the telephone tax is deemed to be on the consumer, and the telephone company is simply the statutory collection agent for the tax owed by and paid by the consumer. In contrast, the electricity tax of subsection 5502(b) is formally imposed on the distributor. That, says the state, suggests that the Delaware legislature intended that distributors pay the electricity tax. The United States responds that the itemization and pass-through provisions of subsection 5502(c) apply to regulated distributors, which suggests that the Delaware legislature intended that consumers would pay the electricity tax via *their distributors.*

6. In its complaint, the United States sought a refund of all public utility taxes imposed on Dover Air Force Base's purchases of electricity from Delmarva. In its motion for summary judgment and subsequently, however, the United States has limited its request to a refund of taxes paid within six years of the date the suit was filed. Because of the United States' concession, we need not review the district court's conclusion that a six-year statute of limitations applies under 28 U.S.C. § 2415 (1988).

*ed States v. State of Delaware*, 755 F.Supp. 119 (D.Del.1991).

From the final judgment of January 16, 1991, the United States appeals. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1345, and 2201 (1988), and we have appellate jurisdiction under 28 U.S.C. § 1291 (1988). This case involves no genuine issues of material fact: the parties do not dispute the content of the provisions of Delaware's public utility tax or the facts regarding its application to federal installations, but only its constitutionality as applied. The parties agree that the only issue before us is a purely legal one properly decided on summary judgment. We therefore exercise plenary review, and if we conclude that the district court erred, we must not only reverse the district court's judgment, but also instruct it to enter judgment for the United States (after calculating the amount of back taxes and interest to be refunded).

## II. THE LEGAL INCIDENCE OF THE DELAWARE TAX ON THE DISTRIBUTION OF ELECTRICITY

### A. *Basic Principles of Federal Immunity from State Taxation*

■ No provision of the United States Constitution explicitly provides that the states may not tax the federal government without congressional consent. Rather, the Supreme Court has read that prohibition to be implicit in the Supremacy Clause of Article VI since the landmark case of *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 4 L.Ed. 579 (1819), where Chief Justice John Marshall held that Maryland's taxation of the Bank of the United States was unconstitutional.[7] As Justice Thurgood Marshall pointed out much later, *McCulloch* can be read broadly or narrowly. See *First Agricultural National Bank of Berkshire County v. State Tax Commission*, 392 U.S. 339, 349–51, 88 S.Ct. 2173, 2178–79, 20 L.Ed.2d 1138 (1968) (Marshall dissenting). Read narrowly, *McCulloch* merely struck down a discriminatory state levy that taxed federally chartered banks but not state-chartered banks and stated a general rule invalidating state taxes that "retard, impede, burden, or ... control" constitutionally proper federal operations, 17 U.S. (4 Wheat) at 435. On that view, nondiscriminatory state taxes would be constitutional if they do not burden federal functions.

But *McCulloch* is famous for Chief Justice Marshall's statement (albeit in dictum) that "the power to tax is the power to destroy," 17 U.S. (4 Wheat) at 429, which implied a broader rule: the Supremacy Clause forbids all state taxation of federal entities. The Supreme Court in fact adopted the latter reading of *McCulloch* and the Supremacy Clause, viewing all state taxes on federal entities as insults to national sovereignty and impermissible burdens on federal operations. Since 1819, the Court has consistently struck down even nondiscriminatory state taxes directly imposed on federal entities. See, for example, *United States v. State Tax Commission of Mississippi*, 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975); *Kern–Limerick, Inc. v. Scurlock*, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954); *United States v. Allegheny County*, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944).

Until 1937, the Court even invalidated state taxes imposing an *indirect* economic burden on the United States. For example, state taxes on private companies' earnings from federal government contracts were struck down because at least part of those taxes were passed on to the federal government. See *South Carolina v. Baker*, 485 U.S. 505, 517–23, 108 S.Ct. 1355, 1363–66, 99 L.Ed.2d 592 (1988) (recapitulating the rise and fall of the doctrine). But beginning with the seminal case of *James v.*

---

7. The Court's broad, structural treatment of the Supremacy Clause is quite analogous to its implication of a "dormant," negative aspect to the Commerce Clause, U.S. Const., art. I, § 8, cl. 3. The Commerce Clause was written as an affirmative grant of federal power, but the Supreme Court since Chief Justice Marshall's time has nonetheless read it to forbid excessive state interference in interstate commerce, again absent congressional authorization. The Court, no doubt, felt both interpretations necessary to preserve federal sovereignty in an era (now past) when state power was far more significant than federal influence.

*Dravo Contracting Co.*, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937), the Court began to narrow its view of intergovernmental tax immunity by holding that non-discriminatory taxes against government contractors were valid if they did not interfere with performance of federal functions, even though their economic burden falls in part on the federal government. See also *Alabama v. King & Boozer*, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941).

The modern Court has not entirely rejected the broader view of *McCulloch* and the doctrine of intergovernmental tax immunity, however. In *First Agricultural National Bank*, three Justices in dissent called for a further narrowing so that only discriminatory direct state taxes on the federal government (the type at issue in *McCulloch*) would be prohibited. 392 U.S. at 352, 88 S.Ct. at 2180 (Marshall, joined by Harlan and Stewart, dissenting). But that argument did not prevail, and the Court's cases have yet to validate *any* congressionally unauthorized state taxes found to be direct taxes upon the United States. See, for example, *Mississippi Tax Commission* (tax on sale of liquor could not be applied to sales to post exchanges at military bases); *First Agricultural National Bank* (majority opinion) (taxes on sales of property to national banks are unconstitutional).

As a result, the cases turn on fine distinctions. For example, *Kern–Limerick* held that a state tax on sales of property directly to the federal government for use by a government contractor was unconstitutional, even though *King & Boozer* and *Dravo* held that the tax would have been permissible if the property were received by the contractor directly and the tax were passed on and paid by the government indirectly. Nevertheless, today's black letter law is clear. As the Supreme Court recently summarized it:

> [U]nder current intergovernmental tax immunity doctrine the States can never tax the United States directly but can tax any private parties with whom it does business, even though the financial burden falls on the United States, as long as the tax does not discriminate against the United States or those with whom it deals.... A tax is considered to be directly on the Federal Government only "when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities."

*South Carolina v. Baker*, 485 U.S. at 523, 108 S.Ct. at 1366 (citations omitted). See also *United States v. New Mexico*, 455 U.S. 720, 730–38, 102 S.Ct. 1373, 1380–84, 71 L.Ed.2d 580 (1982) (extensive summary of the case law).[8]

---

**8.** The direct/indirect distinction in constitutional law has long been criticized, but the Supreme Court has only partially interred it. As suggested in note 7, the implication of federal tax immunity from the Supremacy Clause was akin to the implication of negative restrictions on state power to regulate interstate commerce from the Commerce Clause. The inadequacy of the direct/indirect distinction in Dormant Commerce Clause cases was apparent in the 1920s, see *DiSanto v. Pennsylvania*, 273 U.S. 34, 44, 47 S.Ct. 267, 271, 71 L.Ed. 524 (1926) (Stone, joined by Holmes and Brandeis, dissenting), but the Court has never abandoned it fully, despite coming close at times, see *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (using balancing test). For those cases, the Court has instead adopted a two-tiered test that, at least nominally, employs "directness" terminology.

"Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). In contrast, "[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state economic interests," the statute is virtually per se unconstitutional. *Brown–Forman Distillers, Inc. v. New York State Liquor Authority*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). The Court has recognized, however, that there is "no clear line" separating the two categories, and that the real issue in all cases is the effect of the statute. *Id.* Because the decisive question in Dormant Commerce Clause cases is thus the statute's effect, not its manner of imposition, statements there about "directness" may only be shorthand for the conclusion on effects.

For purposes of the *affirmative* grant of federal power under the Commerce Clause, moreover, the Court long ago abandoned the direct/indirect distinction as unhelpful. The fed-

## B. *The Legal Incidence of Subsection 5502(b)*

Because the tax in this case does not discriminate against the Dover Air Force Base, the only issue before us is whether Delaware's tax should be considered a tax on Delmarva whose economic burden falls indirectly on the United States—in which case it is constitutional—or whether, because of the pass-through provision, the tax should be considered a direct tax on the United States—in which case it is unconstitutional under current law. In doctrinal terms, the sole question that we must decide is whether the "legal incidence" of the Delaware tax falls upon the United States. Although "the line between the taxable and the immune has been drawn by an unsteady hand," *Allegheny County*, 322 U.S. at 176, 64 S.Ct. at 910, we are guided by a significant body of case law from both the Supreme Court and the lower courts in making this characterization.[9]

At the outset, we must distinguish the *legal* incidence of a tax from its *economic* incidence. The economic incidence of a tax defines who ends up bearing its burden in fact. As courts have long recognized, if a sales tax is nominally imposed on a government contractor selling goods or services to the government, the tax may be passed through so that the federal government bears part of the burden of the tax in the form of higher prices.[10] The economic inci-

eral government may "directly" regulate entirely in-state activities if they substantially affect interstate commerce. See, for example, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (rejecting the former distinction and permitting federal regulation of manufacturing activities).

Perhaps the distinction will fade in Supremacy Clause jurisprudence as well. The current disparity in treatment of direct and indirect taxes is not required by the constitutional text. Furthermore, as the Court has long recognized, there is no economic difference of any substance between direct and indirect taxes. At oral argument in this case, counsel for the United States suggested that a bright line rule is appropriate to prevent insults to federal sovereignty, even if that rule is overbroad. But the line between direct and indirect taxation is not always bright. See, for example, *United States v. Maryland*, 471 F.Supp. 1030 (D.Md.1979); *United States v. City of Leavenworth*, 443 F.Supp. 274 (D.Kan.1977); Decision of the Comptroller General, Matter of 9–1–1 Tax of Arizona, File No B–238410 (Sept. 7, 1990).

More basically, although during the 1800s the power of the federal government was perhaps so insecure that *any* federal duty to pay taxes to the states—directly or indirectly, discriminatorily or nondiscriminatorily—was necessarily an affront to federal sovereignty, that is no longer the case. Perhaps, therefore, today's Supreme Court will continue the narrowing that began with *Dravo* and dismantle the current blanket prohibition against all direct state taxes paid by the federal government. The Court might decide to retain the core of *McCulloch* by forbidding only state taxes that discriminate against the federal government (and thereby impugn federal sovereignty) and state taxes whose burdens are so substantial that they impede federal operations (and thereby threaten federal supremacy). Such a modification would make the doctrine easier to apply and truer to its

purposes. After all, "[t]he power to tax is not the power to destroy while [the Supreme] Court sits." *Panhandle Oil Co. v. Mississippi ex rel Knox*, 277 U.S. 218, 223, 48 S.Ct. 451, 72 L.Ed. 857 (1928) (Holmes dissenting).

The Court might even reconsider federal constitutional immunity from state taxation altogether. As Justices Marshall, Harlan, and Stewart pointed out in their dissent in *First Agricultural National Bank*, 392 U.S. at 352, 88 S.Ct. at 2180. Congress has the undoubted power to immunize the federal government from any state tax. Such a legislated immunity would bind the states under the express terms of the Supremacy Clause. On the other hand, although in the analogous context of the Dormant Commerce Clause, many scholars have called for an abolition of implied restrictions for similar reasons, the Supreme Court has yet to show any readiness to reconsider that doctrine, either. See, for example, Martin H. Redish & Shane V. Nugent, *The Dormant Commerce Clause and the Constitutional Balance of Federalism*, 1987 Duke LJ 569; Julian Eule, *Laying the Dormant Commerce Clause to Rest*, 91 Yale LJ 425 (1982). At all events, any future doctrinal shifts must be made by the Supreme Court, not this court.

**9.** Neither side points to any evidence that Congress has specifically authorized or forbidden taxes of the type at issue in this case. Accordingly, we must decide the constitutional default rule for this type of tax, fully aware that Congress could decide at any time to reverse our decision statutorily.

**10.** Theoretically, at least, the governmental buyer will not bear the entire burden of the tax. If the tax is nominally on the seller, part of it will be passed through to the buyer in the form of higher prices, but part of it will burden the seller because fewer goods will be sold. The

dence of a sales tax, however, does not, as a theoretical matter, depend on whether the tax is formally imposed on the buyer or the seller.[11]

At all events, the Supreme Court has held that the economic incidence of a tax does not necessarily determine the legal incidence of the tax. *Washington v. United States*, 460 U.S. 536, 540, 103 S.Ct. 1344, 1346, 75 L.Ed.2d 264 (1983); *United States v. New Mexico*, 455 U.S. at 734, 102 S.Ct. at 1382. On the other hand, the legal incidence does not necessarily fall on the person or entity that the state holds legally responsible for paying the tax. *Mississippi Tax Commission*, 421 U.S. at 607, 95 S.Ct. at 1877; *First Agricultural National Bank*, 392 U.S. at 347, 88 S.Ct. at 2177. Courts must look "beyond the bare face of the taxing statute to consider all relevant circumstances." *United States v. City of Detroit*, 355 U.S. 466, 469, 78 S.Ct. 474, 475, 2 L.Ed.2d 424 (1957).

As the district court properly recognized, both economic incidence and formal liability are normally relevant in determining legal incidence. Also relevant as a general matter are the intent of the taxing authority, see *Mississippi Tax Commission*, 421 U.S. at 608–09, 95 S.Ct. at 1877–78; *First Agricultural National Bank*, 392 U.S. at 347–48, 88 S.Ct. at 2177–78, and the rights and obligations involved in the transaction being taxed, see *United States v. City of Leavenworth*, 443 F.Supp. 274, 282 (D.Kan. 1977). As to the latter, it may be relevant, for example, if a seller as nominal payor is in fact simply a collection agent for the tax, or if the buyer is secondarily liable for the tax in case the seller does not pay.

As a result, the lower courts, including the district court in this case, 755 F.Supp. at 121–22, have generally adopted a balancing test for determining legal incidence of utility taxes and other nonstandard sales taxes. See, for example, *Leavenworth*, 443 F.Supp. at 282–83; *United States v. Mary-*

*land*, 471 F.Supp. 1030, 1036–38 (D.Md. 1979). These cases recognize, however, that the Supreme Court has adopted at least one per se rule on legal incidence: if a state tax on a supplier is mandatorily passed through to the United States as a consumer, the seemingly indirect tax is functionally indistinguishable from a tax directly imposed on the United States and is therefore unconstitutional.

For example, in *First Agricultural National Bank*, the Court ruled it "indisputable that a sales tax which by its terms must be passed on to the purchaser imposes the legal incidence of the tax on the purchaser." 392 U.S. at 347, 88 S.Ct. at 2177 (citing *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 99, 62 S.Ct. 1, 3, 86 L.Ed. 65 (1941)). Where the Massachusetts legislature required that a sales tax be passed on, the Court concluded that the legislature intended that the tax be passed on to the purchaser, even though there was no penalty against a seller who did not pass on the tax. *Id.*, 392 U.S. at 347–48, 88 S.Ct. at 2177–78. For the Court's purposes, that legislative intent controlled. *Id.* at 348, 88 S.Ct. at 2178.

Similarly, in *Mississippi Tax Commission*, the Court held that a markup on sales of liquor by the state Tax Commission to military bases was effectively a sales tax collected by the seller and remitted to the state. 421 U.S. at 608, 95 S.Ct. at 1877. Justice Brennan, writing for seven Justices, restated the rule that

> where a State requires that its sales tax be passed on to the purchaser and be collected by the vendor from him, this establishes as a matter of law that the legal incidence of the tax falls upon the purchaser.

*Id.* The Court concluded that "[t]he Tax Commission clearly intended—indeed, the scheme unavoidably requires—that the out-of-state distillers and suppliers pass on the

actual split of the economic incidence depends on the elasticities of supply and demand in each particular market.

11. No matter on whom the tax nominally falls, the market price (including the tax) and the

quantity sold will be the same. Accordingly, the economic incidence will be shared in the same way: if the tax is nominally on the buyer, part of it will be passed back to the seller in the form of reduced quantity demanded.

markup to the military purchasers," and was therefore unconstitutional absent congressional consent. *Id.* at 609, 95 S.Ct. at 1878.

In this case, as in *Mississippi Tax Commission* and *First Agricultural National Bank,* we need not apply a balancing test because we conclude that the Delaware utility tax is mandatorily passed on to consumers, and therefore, under current intergovernmental tax immunity doctrine, the tax is necessarily unconstitutional as applied to sales of electricity to the Dover Air Force Base. Simply put, subsection 5503(c) is a mandatory pass-through of the tax of subsection 5502(b). For regulated distributors such as Delmarva, the Public Service Commission

> is *directed*, after consultation with such distributor and *without a public hearing*, to adjust the tariff of such distributor so that the tax *is passed through* pro rata to the distributor's customers and the distributor's earnings are neither increased nor decreased by such tax.... [T]he tax *shall* appear on the customer's bill as a separate item....

30 Del.Code Ann. § 5502(c) (emphasis added).

Delaware engages in creative verbal gymnastics to suggest that the pass-through is somehow optional, but lacking any legislative history to the contrary, we cannot read "directed" as discretionary. The statute expressly denies a public hearing and it uses "is passed through" rather than "may be passed through," which further suggests that the Delaware legislature intended to create a mandatory pass-

through. The requirement (starting in 1985) of separate itemization on customer's bills also confirms our interpretation that the legislature intended that consumers pay the tax indirectly via distributors.[12] Our conclusion is solidified by 30 Del.Code Ann. § 5504(b), which provides that distributors can take credits against the tax owed for amounts billed to consumers but not collected. Thus, if the consumer does not pay the tax to the distributor, the distributor is not liable for the tax, which suggests that the consumer is expected to pay the tax in reality.[13]

We concede that subsection 5503(b) characterizes the tax as on the distributor and not on consumers, but in cases where subsection 5502(c) applies, subsection 5503(b) is a mere formality that cannot govern the constitutional inquiry. See *Mississippi Tax Commission,* 421 U.S. at 607–08, 95 S.Ct. at 1877–78 (nominal liability under state law not controlling); *City of Detroit v. Murray Corp. of America,* 355 U.S. 489, 492, 78 S.Ct. 458, 459, 2 L.Ed.2d 441 (1958) (substance, not state characterization as to form, governs the inquiry into legal incidence).[14] Delaware and the district court have relied heavily on the *Leavenworth* and *Maryland* cases, which upheld local and state utility taxes against Supremacy Clause challenges. But both are distinguishable because, according to those courts, the taxing authorities did not intend to establish mandatory pass-throughs. See *Maryland,* 471 F.Supp. at 1038–40 (pass-through was "authorized" but had never been interpreted as mandatory); *Leaven-*

---

**12.** Delaware notes that the requirement of separate itemization was added later at the behest of distributors, and so is not indicative of the legislature's original intent. Perhaps so, but in our view, it is evidence that the legislature understood that consumers in fact pay the tax and intended to keep the situation that way.

Delaware also contends that the provision in subsection 5502(c) for consultation by the Commission with the distributor, see note 4, suggests that a pass-through would not be mandatory for irrational distributors (not including Delmarva) who would rather pay the tax themselves without reimbursement. But more likely, the consultation requirement simply ensures that the Commission adjusts the electricity price proper-

ly to ensure that the tax does not affect utilities' earnings.

**13.** See also 30 Del.Code Ann. § 5507 (Michie Supp 1990), which provides that certain tax rebates are to be paid to the consumers who qualify for them. The term "rebate" would make no sense unless the legislature intended that those consumers make the tax payments in the first place.

**14.** Subsection 5503(b) might not be a mere formality in cases where the pass-through of subsection 5502(c) does not apply—namely in cases involving nonregulated distributors such as the City of Dover. We do not decide that closer question here.

*worth,* 443 F.Supp. at 282–83 (although state Corporation Commission had required the tax to be passed on, the taxing authority, the city, had not, which was dispositive). In this case we have a mandatory pass-through, and the per se rule of unconstitutionality applies.

The district court suggested that we might distinguish *First Agricultural National Bank* and *Mississippi Tax Commission* on the ground that this case involves a regulated industry. Delaware is certainly correct that subsection 5502(c) is designed to ensure that the tax does not affect the profitability of regulated utilities. The mandatory pass-through scheme may merely recognize that the tax on distributors is a cost of their doing business like any other, and, because the industry is regulated, that cost is reflected in the utilities' rate base. Therefore, suggests Delaware, the tax is "really" on the distributor, as subsection 5503(b) declares, and the United States is only indirectly (and hence constitutionally) suffering the burden of the tax.

We conclude, however, that the Delaware legislature intended that consumers pay the tax, and we cannot find any basis in the Supreme Court case law for an exception to the per se rule of *First Agricultural National Bank* and *Mississippi Tax Commission.* The Supreme Court may decide to carve out a "regulated-utilities exception" to the "mandatory pass-through exception" to the modern rule that state taxes that indirectly burden the federal government are constitutional, although that would merely add another layer of complexity to an area of law that is already quite complex. Particularly in view of the vulnerable doctrinal basis of the jurisprudence, the Court may even decide to reconsider the fine distinctions it has made in this area, see note 8, but only that Court can cut back on its own decisions.[15] We therefore must declare the Delaware utility tax unconstitutional as applied to sales to the federal government.

**15.** The Delaware utility tax is a perfect example of where current doctrine may go awry. Delaware treats the Dover Air Force Base no differently than any other consumer of electricity.

## III. CONCLUSION

Because 30 Del.Code Ann. § 5502(c) mandatorily passes through to consumers the tax nominally imposed on distributors of electricity by 30 Del.Code Ann. §§ 5502(b) and 5503(b), for constitutional purposes the legal incidence of the tax falls on consumers, including the federal government. Longstanding Supreme Court case law holds that state taxes whose legal incidence falls on the federal government are unconstitutional per se. Therefore the federal government is entitled to declaratory and injunctive relief that Delaware cannot require the federal government to pay taxes to Delmarva, and Delaware must refund the utility taxes paid by the federal government for the last six years. The judgment of the district court in favor of the Delaware defendants will be reversed. The case will be remanded to the district court for further proceedings consistent with this opinion.

The tax burden is minimal in both absolute and percentage terms, and Congress has made no move to restrict Delaware's policy, even though the tax has been in effect for years.